UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE MJK FAMILY LLC, a Michigan limited
liability company, AIR BANKS, LLC, a Florida
limited liability company, WINDSONG LLC, a
Michigan limited liability company, MARK II
AVIATION, LLC, a Nevada limited liability
company, CONVENIENSO, LLC, an Illinois
limited liability company,  S4AIR LLC, a
Michigan limited liability company, NATIONAL
CITY BANK as Trustee for THE DAVID L.
HAYES IRA, a national banking association,
ROBERT SKANDALARIS, an individual, and
DON DEFOSSET, an individual,

              Plaintiffs,

v.

CORPORATE EAGLE MANAGEMENT
SERVICES, INC., a Michigan corporation, and
RICHARD M. NINI, in his capacity as an Officer
and Director of Corporate Eagle Management
Services, Inc., and as an individual,

              Defendants.

_____

Case No.

Hon.

## **COMPLAINT**

Plaintiffs The MJK Family LLC, Air Banks, LLC, Windsong LLC, Mark II Aviation,

LLC, Convenienso, LLC, S4Air LLC, National City Bank as Trustee for the David L. Hayes

IRA, Robert Skandalaris, and Don DeFosset (collectively "Plaintiffs"), by and through their

attorneys, Miller, Canfield, Paddock and Stone, P.L.C., and for their Complaint against

Defendants Corporate Eagle Management Services, Inc. ("CEMS"), a Michigan corporation, and

Richard M. Nini, as President and CEO of CEMS and as an individual (collectively

"Defendants"), allege as follows:

## PARTIES

1.      Plaintiff The MJK Family LLC is a Michigan limited liability company.

2.      Plaintiff Air Banks, LLC is a Florida limited liability company.

3.      Plaintiff Windsong LLC is a Michigan limited liability company.

4.      Plaintiff Mark II Aviation, LLC is a Nevada limited liability company.

5.      Plaintiff Convenienso, LLC is an Illinois limited liability company.

6.      Plaintiff S4Air LLC is a Michigan limited liability company.

7.      Plaintiff National City Bank, Trustee of the David L. Hayes IRA is a national banking association.

8.      Plaintiff Robert Skandalaris is an individual residing in Michigan.

9.      Plaintiff Don DeFosset is an individual residing in Florida.

10.     Defendant Corporate Eagle Management Services, Inc. is a Michigan corporation with its principal place of business in Michigan.

11.     Defendant Richard M. Nini is an individual residing in Michigan.

## JURISDICTION AND VENUE

12.     Jurisdiction is proper in this case under 28 U.S.C. § 1331 because this action arises under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b). Jurisdiction is also appropriate under 28 U.S.C. § 1367(a).

13.     Venue is appropriate under 28 U.S.C. § 1391, as Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred here.

## GENERAL ALLEGATIONS

**I.      Corporate Eagle Management Services and Richard Nini**

14.      Defendant CEMS, formerly known as Tradewinds Aviation, Inc., was originally founded in Michigan in 1985 by Defendant Richard Nini ("Nini").

15.      Nini is CEMS's majority shareholder, owning over fifty-percent of its outstanding stock.  He is also a member of CEMS's board of directors, and the company's President and Chief Executive Officer.  In this capacity, Nini dominated and controlled CEMS.

16.      From the time of its founding to the present, CEMS has been headquartered in Michigan and maintained one location in southeast Michigan.

17.      CEMS manages and maintains aircraft for various companies affiliated with Art Van Elslander.  These companies, on information and belief, include Corporate Eagle Capital, LLC, Corporate Eagle Two, LLC, Corporate Eagle Four, LLC, Corporate Eagle Five, LLC, and Corporate Eagle Eighty One, LLC.  Under Nini's control, CEMS's management services for these companies include selling and leasing fractional interests in aircraft.  In return for these management services, CEMS, and thereby Nini, receives a commission when it executes a sale or a lease.

18.      CEMS offers fractional jet-ownership programs to "members" who purchase or lease shares in the aircraft that CEMS manages.  The members purchase or lease the shares based on their planned usage.  Fractional ownership is purportedly cheaper than purchasing an airplane outright.

19.      In addition to the cost of the fractional ownership, CEMS charges its members usage fees, fuel surcharges, and management fees.  The management fees cover maintenance of the airplanes, hangars and other facilities, along with insurance and salaries for the flight crews

3

and maintenance technicians.  These fees vary depending on the type of aircraft the member uses.

20.     Nini became aware of an increased seasonal demand for flight services between southeastern Michigan and Florida.  In response to this demand, Nini decided to expand CEMS by opening a second base of operations in Florida that would include a private, gated hangar and administrative facilities.  Nini also wanted to purchase between one and five aircraft.

21.     The planned expansion to Florida required establishing a hub near an airport within one of several target markets.  Ultimately, Nini planned to build a $5-million-plus, private terminal with adjacent hangars at the St. Petersburg-Clearwater International Airport.

## II.     Corporate Eagle Jet, LLC

22.     Nini sought to acquire the necessary capital to expand through a $5,000,000 recapitalization.  This recapitalization involved forming a transaction company that Nini would use to infuse CEMS with cash and to purchase planes.

23.     Under Nini's recapitalization plan, Corporate Eagle Jet, LLC ("CEJ") would be formed as a Michigan limited liability company and be capitalized with $5,000,000.  CEJ would then immediately purchase a thirty-percent equity position in CEMS for $1.2 million.   In addition, CEJ would receive three seats on CEMS's board of directors.

24.     On June 23, 2006, Nini formed CEJ by filing articles of organization with Michigan's Department of Labor and Economic Growth.  Nini then began soliciting investors for this newly-formed limited liability company.

## III.     Nini's Solicitations and Misrepresentations

25.     During his solicitations for investors in CEJ, Nini touted the value of opening a second location in Florida, emphasizing the opportunity it presented to form new relationships

4

with Florida businesses and individuals. Accordingly, Nini also emphasized that CEJ would specifically market its aircraft to businesses and individuals in Florida.

26. To avoid having to file a registration statement with the Securities Exchange Commission, Nini sought to rely on the private-placement exemption in the SEC's Regulation D, 17 C.F.R. §§ 230.501 *et seq*. However, Nini provided potential investors with information about his business and proposal for CEJ.

27. Nini, as CEMS's President and CEO, prepared a binder of documents entitled "Corporate Eagle Jet, LLC Investment Presentation." The Investment Presentation contained various written materials regarding the CEMS recapitalization plan and CEJ's proposed business ("Offering Materials").

28. Specifically, the Offering Materials included an executive summary of the recapitalization plan; CEMS's investment proposal; CEJ's proposed Operating Agreement; a Subscription Agreement incorporating the Operating Agreement, with exhibits; a valuation of CEMS's business; CEMS's balance sheet as of June 30, 2006; a description of CEMS's plan to expand to Florida; statistics on Florida; a list of target markets in Florida; a description of the necessary facilities for a location in Florida; a summary of projected income and expenses; an organization chart for CEMS; and a summary of business aviation.

29. CEMS's proposed Operating Agreement for CEJ described the company's purpose as follows:

> (i) acquire from Tradewinds [CEMS] one thousand three hundred eighty-seven (1,387) of newly issued and outstanding shares of the capital stock of Tradewinds ("TRA Interest"), (ii) purchase a previously owned Raytheon Hawker 800XP aircraft ("Aircraft"), (iii) upgrading and refurbishing the Aircraft, (iv) transferring ownership interest in the Aircraft to single purpose limited liability company ("SPE"), (v) selling and/or leasing the interests of the SPE in quarter or one-eighth shares ("Shares") (Sections 1.2(ii),

5

(iii), (iv) and (v) are collectively referred to as the "Process"), and
(vi) repeat the process once the last Share is sold or leased.

30.     Pursuant to the Subscription and Operating Agreements, CEJ would be managed

by CEMS under Nini's control.  Section 5.1 provided as follows:

> Except as otherwise specifically provided in this Agreement, the
> business and affairs of the Company shall be managed by the
> Manager and all actions, decisions, determinations, designations,
> directions, appointments, consents, approvals, selections and the
> like, to be taken, made, or given by the Members, including,
> without limitation, a sale, financing, refinancing or lease of any or
> all of the property of the Company or other sale of the business of
> the Company irrespective of form (collectively, "Actions and
> Decisions") shall be taken, made or given by the Manger in its sole
> and absolute discretion, and all such Actions and Decisions shall
> be controlling and binding upon the Company and all of the
> Members.  The Manager has the full and exclusive power to
> manage, control, administer and operate the business and affairs of
> the Company, to make all decisions affecting the Company, to act
> for and bind the Company, and to take such actions as the
> Manager, in the Manager's sole discretion, determines are
> necessary, convenient, or advisable to carry out the purposes of the
> Company in compliance with the requirements of fiduciary duty
> set forth in this Agreement.

31.     The Subscription Agreement expressly stated that CEJ's success would "depend

in large part upon the ability of the Manager to effectively manage the business and affairs of the

LLC."

32.     As CEJ's Manager, CEMS, under Nini's control, was responsible for selling and

leasing fractional shares in the aircraft that CEJ purchased.  In return, CEJ would pay CEMS a

transaction fee of two percent of the gross value of each sale or lease, and a two percent

transaction fee to resell trade-in aircraft.

33.     CEMS did not disclose in its Offering Materials, or otherwise, the fact that Nini,

as its President and CEO, was responsible for selling and leasing fractional shares in aircraft for

other companies.  Nor did CEMS disclose that Nini received commissions from these companies when he executed a sale or lease of an aircraft.

34.     CEMS's failure to disclose Nini's material conflicting and competitive interests was misleading due to CEMS's reliance on the private-placement exemption in Regulation D, Rule 506, 17 C.F.R. § 230.506.  Having relied on Rule 506, CEMS was obligated under Rule 502, 17 C.F.R. § 230.502(b)(2)(i)(A), to disclose all material facts necessary to a complete understanding of CEJ's business and the securities being offered, including Nini's business background and current business interests pursuant to Item 401 of Regulation S-K, 17 C.F.R. § 229.401.  By failing to disclose the existence of Nini's material conflicting and competing interests, CEMS created the false impression that no such interests existed or that it was not aware of such interests.

35.     In addition, CEMS's omissions rendered certain statements in the Offering Materials materially misleading.

36.     Exhibit C to the Subscription Agreement, entitled "Risk Factors," listed two potential "Conflicts of Interest" that could arise out of CEMS's business with CEJ, and stated:

> The LLC is subject to various potential conflicts of interest arising out of the relationships between the Manager, the LLC and their affiliates.  These conflicts include, but are not limited to, those arising from:
>
> The Manager or its affiliates entering into contracts and rendering a number of services to the LLC which it will be paid a fee or from which it may profit; or
>
> The Manager and the LLC are being represented in this transaction by the same legal counsel.  Consequently, the Subscriber should retain its own independent counsel.

37.     The statements in Exhibit C are materially misleading because, CEMS, having spoken on the subject of conflicts of interest arising from the Manager's dealings with CEJ,

7

assumed a duty to disclose all material facts related to that subject, but failed to disclose that at the time of the offering Nini actually had material interests in ventures that directly conflicted with and competed against CEJ, thereby giving the false impression that the only potential conflicts of interest would arise from CEMS's dealings with CEJ and not from Nini's or CEMS's pecuniary interests in CEJ's competitors.

38.     Section 5.4 of the Operating Agreement, entitled "Transactions with Affiliates," generally permitted CEMS to enter into transactions with its affiliates, as long as the transactions were disclosed to Plaintiffs and were commercially reasonable, and stated:

> The Manager shall have the authority to enter into any transaction with, or to hire, employ or contract with, any individual, partnership, corporation, or entity that is an affiliate of the Manager ("Interested Person") if the terms or conditions of any agreement, contract, or understanding entered into between the Company and an Interested Person are commercially reasonable at the time of execution of the agreement, contract or understanding. … Notwithstanding the foregoing provisions of this Section 5.4, (i) any direct or indirect interest of an Interested Person in any contract or other act, other than its interest as a Member, shall be disclosed to the Members and (ii) such contract shall contain commercially reasonable terms and market rates.

39.     Section 5.5 of the Operating Agreement, entitled "Other Activities Permitted," addressed the possibility of conflicts of interest between CEJ and its management, and stated:

> The Members, Manager, and their respective affiliates may have interests in other present or future ventures, including ventures that are competitive with the Company, and that, notwithstanding a Members' or the Manager's status as a Member or Manager, as the case may be, a Member, the Manager, and such Member's and Manager's affiliate(s) shall be entitled to obtain and/or continue their individual participation in all such ventures without (i) accounting to the Company or the other members for any profits with respect thereto, (ii) any obligation to advise the other Members or the Company of business opportunities for the Company which may come to such Member's or such Member's affiliate's attention as a result of such Member's or Member's affiliate's participation in such other ventures or in the Company, and (iii) being subject to any claims by the Company or any other

> Member whatsoever on account of such participation.  Except as
> otherwise expressly provided in this Agreement, each Member
> waives any rights a Member might otherwise have to share or
> participate in such other interests or activities of any other Member
> or the Member's affiliates.

40.     Taken together, the statements in sections 5.4 and 5.5 are materially misleading because CEMS, having spoken on the subject of Nini's and its conflicting and competing interests and being obligated to disclose interested transactions, assumed a duty to disclose all material facts related to those subjects, but failed to disclose that at the time of the offering Nini actually had material interests in ventures that directly conflicted with the interests of CEJ and its Members, thereby giving the false impression that no such interests presently existed or that CEMS was not aware of such interests.

## IV.    Plaintiffs Invest in Corporate Eagle Jet

41.     In the fall of 2006, Nini approached Plaintiffs, and offered each of them an opportunity to invest as members of CEJ for $500,000.  Nini explained that his company, CEMS, was in the business of selling and leasing fractional interests in aircraft and was planning to open a location in Florida to provide air transportation between Michigan and Florida.  Nini also explained that CEMS intended to market its planes to Florida customers.  Furthermore, Nini described the business plan included in the Offering Materials, including his plan to form CEJ and use it to facilitate the purchase of new aircraft.  Nini presented each Plaintiff with the Offering Materials, but did not disclose the nature of his or CEMS's involvement with Art Van Elslander or that his and CEMS's relationship with Mr. Van Elslander would be competitive to and directly conflict with CEJ's business to CEJ's detriment.

42.     Plaintiffs did not know that Mr. Van Elslander actually owned CEMS's aircraft and paid CEMS, under Nini's control, a commission for selling and leasing fractional interests in those aircraft.

9

43.     Between the fall of 2006 and April 2007, based on discussions with Nini and the Offering Materials, each Plaintiff purchased a membership in CEJ for $500,000.  The Plaintiffs transmitted the funds through a wire transfer to a bank account designated by CEMS.

44.     Each Plaintiff relied on the representations in the Offering Materials when making the investment decision and would not have purchased the membership in CEJ had it been known that Nini would be competing against CEJ.

**V.     Nini's Lies Come to Light**

45.     Pursuant to Nini's recapitalization plan, CEJ received three seats on CEMS's board of directors.  Those seats were filled by Robert Banks, the managing member of Plaintiff Air Banks, LLC, Walter Knysz, the managing member of Plaintiff Windsong LLC, and Michael Kowalski, the managing member of Plaintiff The MJK Family LLC.

46.     CEMS's first board meeting after Plaintiffs invested in CEJ occurred in April 2007.  Nini, as CEMS's President and controlling shareholder, ran the meeting.  At the meeting Nini's conduct demonstrated that he had very little business experience, if any.  At the meeting the board discussed business related to CEJ, specifically opening a location in Florida.  But this business plan was never put into effect.

47.     CEMS held its second board meeting on or about July 23, 2007.  It was at this meeting that Plaintiffs, for the first time, learned of Nini's and CEMS's interests with Mr. Van Elslander.  Discussions at the July meeting again included business related to CEJ, specifically purchasing a Raytheon Hawker 800XP.  Nini stated that he found several prospective clients for a Hawker 700.  Since CEJ did not own a Hawker 700, Mr. Knysz asked Nini who owned the Hawker 700 and whether Nini was marketing, selling and leasing fractional interests in aircraft for entities other than CEJ.  Nini then revealed that he managed aircraft for Mr. Van Elslander

10

and Mr. Van Elslander's other Corporate Eagle companies discussed above.  Mr. Van Elslander paid Nini a commission each time he sold or leased a fractional interest in one of Mr. Van Elslander's aircraft.

48.    Upon information and belief, while managing CEJ, Nini was actively marketing, selling, and leasing fractional interests in aircraft for competing entities that were in direct conflict with the interests of CEJ without notifying CEJ, and without giving CEJ an opportunity to market, sell or lease fractional interests in its own aircraft.

49.    Nini's pecuniary interest in selling and leasing fractional interests in Mr. Van Elslander's aircraft directly conflicted with CEJ's interests, and materially impaired his ability, as CEMS's President and majority shareholder, to manage CEJ in Plaintiffs' best interest.

50.    After the July 2007 meeting, when Nini revealed the nature of his involvement with Mr. Van Elslander, Plaintiffs began demanding that he take affirmative action to promote CEJ's interests, including purchasing the Raytheon Hawker 800XP aircraft and commencing construction on a hangar in Florida.

51.    In August 2007, after conferring with each other, Plaintiffs instructed Nini not to compete directly against CEJ to its and their detriment.  In response, Nini assured them that his interests with Mr. Van Elslander were minimal and would not interfere with his management of CEJ.  Nini also assured Plaintiffs that he would soon purchase an aircraft and begin work to open a location in Florida as planned.

52.    In October 2007, CEMS, under Nini's control, caused CEJ to purchase a Raytheon Hawker 800XP ("800XP") for $8.5 million.  CEMS obtained financing from Synovus Bank, a regional bank based in Florida, based on a down payment of $3.8 million from Plaintiffs' invested funds.  As a part of the financing arrangement, Nini agreed to market the

11

800XP in Florida so that Synovus could provide financing to those who purchased fractional interests in the 800XP.  Nini also personally guaranteed the loan.

**VI.     Nini's Mismanagement**

53.     At CEMS's October 2007 board meeting, Nini explained the purchase of the 800XP.  But contrary to his prior representations and his agreement with Synovus, Nini revealed that he would be selling interests in the 800XP in Michigan, the same market in which he worked for Mr. Van Elslander.  Nini explained that he had contacts with a group of investors that owned fractional interests in a Hawker 700—an older model than the 800XP—who were looking to upgrade.  Nini then explained that he planned to sell the interests in CEJ's 800XP to these investors and accept the Hawker 700 as a trade-in.  Nini would then move the Hawker 700 to Florida and begin marketing fractional interests there.  Plaintiffs did not approve this plan. Instead they urged Nini to market the 800XP in Florida according to his original business plan and told him not to accept the Hawker 700 as a trade-in.  But Nini insisted on marketing the 800XP in Michigan and ignored Plaintiffs' advice to market the plane in Florida.

54.     Against Plaintiffs' advice, Nini accepted the Hawker 700 as a trade-in.  Nini then marketed 800XP in Michigan.  But only one investor from the Hawker 700 purchased an interest in the 800XP.  And without explanation to Plaintiffs, Nini allowed the other original Hawker 700 investors to walk away from both planes.  By January 2008 Nini only managed to sell one-quarter of the shares in the 800XP.  Consequently, CEJ had two planes, one that had no investors (the Hawker 700), and one that was three-quarters empty (the 800XP).

55.     At the January 2008 board meeting Nini explained the situation with the Hawker 700 and the 800XP.  Nini indicated that he had no plan in place to market both planes.  In an effort to save their investment, Plaintiffs continued to ask Nini when he would open the hangar

in Florida.  In response to these inquiries, Nini presented several undeveloped ideas.  It became apparent to Plaintiffs that Nini never had a firm business plan in place and, on information and belief, had done no research or planning whatsoever.  Even when Plaintiffs informed Nini that several investors in Florida had been identified, Nini remained fixated on marketing the planes in Michigan.  Indeed, throughout 2008, in response to Plaintiffs' inquiries, Nini continuously delayed plans to open a facility in Florida or move either the Hawker 700 or the 800XP to a Florida location.

56.     At one point in 2008, Nini informed Plaintiffs that he found buyers for the 800XP and had agreed to sell the plane for a price well below what CEJ paid for it.  This deal never came to fruition, however.  According to Nini, one of the prospective buyers refused to go forward with the deal upon learning that David Hayes, the beneficiary of the David L. Hayes IRA administered by Plaintiff National City Bank, was an investor in CEJ.  Nini stated that this unidentified buyer was a past associate of Mr. Hayes and refused to do business with him.  Nini claimed that this prevented him from selling the 800XP to this group of investors.  On information and belief, Nini's statements regarding the unidentified buyer were not true.

57.     By December 2008, with only one quarter of two planes booked, CEJ did not have enough income to maintain the financing with Synovus on the planes and was insolvent.  In order to continue making payments to Synovus, Nini proposed that Plaintiffs each provide him with an unsecured, personal loan of $50,000.  Plaintiffs declined this proposal.

## VII.   Nini Squanders Plaintiffs' Investment

58.     By early 2009, Nini had fallen behind on his payments to Synovus and Synovus called the loan on the 800XP.  Since CEJ had no capital, Nini was personally obligated to pay the balance under his personal guarantee.

59.     Knowing that Nini was personally obligated to pay Synovus and being aware of his conflicting interests with Mr. Van Elslander, Plaintiffs believed that Nini would place his interests ahead of CEJ by selling the 800XP and using the proceeds to satisfy his personal guarantee.  Plaintiffs then specifically instructed Nini not to sell the plane.

60.     On Friday, May 8, 2009, Nini assured Plaintiffs that he would not sell the 800XP, and scheduled a meeting for Monday, May 11, 2009, to discuss various other options.

61.     Notwithstanding his assurance on May 8, Nini commenced the May 11 meeting by announcing that he sold the 800XP to Mr. Van Elslander.  When Plaintiffs asked why he lied, Nini said that he did not want Plaintiffs to take any action to stop the sale.

62.     Now CEJ no longer owns the asset that was the basis for Plaintiffs' investment because Nini acted in his own self-interest under the very conflict of interest that was the subject of his misrepresentations.

63.     Plaintiffs, because of Nini's misrepresentations, conflicting and competing interests, continuous mismanagement and repeated lies, have lost their entire investment.

## COUNT I
(Breach of Fiduciary Duty—Loyalty)

64.     Plaintiffs re-allege and incorporate all of the allegations set forth in paragraphs 1 through 63 as if fully rewritten herein.

65.     As the manager of CEJ, CEMS owed a fiduciary duty to act with the utmost good faith and loyalty to Plaintiffs and not place its interests ahead of Plaintiffs' interests.

66.     As described in paragraphs 1 through 65 above, CEMS, under Nini's control, placed its and Nini's interests ahead of Plaintiffs' interests by, among other things, maintaining business relationships that materially impaired its ability to manage CEJ in Plaintiffs' best

14

interests, failing to keep Plaintiffs fully informed as to CEJ's business, and selling CEJ's only asset in order avoid payment on Nini's personal guarantee.

67.     As a direct and proximate result of CEMS's conduct, under Nini's control, Plaintiffs have sustained damages.


## COUNT II
(Usurpation of Corporate Opportunities)

68.     Plaintiffs re-allege and incorporate all of the allegations set forth in paragraphs 1 through 67 as if fully rewritten herein.

69.     As the Manager of CEJ, CEMS owed a fiduciary duty to Plaintiffs to not divert corporate business opportunities for personal gain at Plaintiffs' expense.

70.     As described in paragraphs 1 through 69 above, CEMS, under Nini's control, diverted opportunities from CEJ to other companies for CEMS's and Nini's benefit.

71.     CEMS's conduct, under Nini's control, constituted a breach of its fiduciary duty to Plaintiffs.

72.     As a direct and proximate result of CEMS's conduct, under Nini's control, Plaintiffs have sustained damages, including lost profits.


## COUNT III
(Breach of Fiduciary Duty—Care)

73.     Plaintiffs re-allege and incorporate all of the allegations set forth in paragraphs 1 through 72 as if fully rewritten herein.

74.     As the Manager of CEJ, CEMS owed a fiduciary duty to Plaintiffs to exercise due care.

15

75.     As described in paragraphs 1 through 74 above, CEMS, under Nini's control, failed to act with due care by refusing to listen to Plaintiffs' advice in their capacity as members of CEMS's board of directors, failing to fully research, investigate, develop and execute the business plan outlined in the Offering Materials, and failing to fully investigate available options for marketing, selling or leasing fractional interests in the 800XP rather than selling it to Mr. Van Elslander.

76.     CEMS's conduct, under Nini's control, constituted a breach of its fiduciary duty to Plaintiffs.

77.     As a direct and proximate result of CEMS's conduct, under Nini's control, Plaintiffs have sustained damages.

**COUNT IV**
(Exchange Act § 10(b) and Rule 10b-5 against CEMS)

78.     Plaintiffs re-allege and incorporate all of the allegations set forth in paragraphs 1 through 77 as if fully rewritten herein.

79.     In connection with the sale of the membership interests in CEJ, CEMS, by the use of the means and instrumentalities of interstate commerce, or the mails, directly or indirectly, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, by failing to disclose that Nini had interests in other business ventures that directly conflicted with and were competitive to CEJ to its detriment.

80.     As CEMS's controlling shareholder and officer, Nini's undisclosed conflicts and competitive interests directly and materially compromised CEMS's ability to manage CEJ in

Plaintiffs' best interest.  This information is of such a nature that a reasonable investor would necessarily rely upon it to determine whether to purchase a membership in CEJ.

81.     CEMS had a duty to disclose Nini's conflicts and competitive interests under the Rules and Regulations governing private-placement offerings, namely Rule 402 of Regulation D and Item 401 of Regulation S-K, in order to present a complete picture of CEJ and to allow investors to adequately evaluate the integrity of CEJ's management and the risks of doing business with said management.

82.     Furthermore, CEMS, having generally addressed the possibility of unspecified conflicts and competitive interests in the offering materials assumed a duty to speak completely and accurately on these issues, and to disclose Nini's existing, material conflicts and directly competitive interests.

83.     Without disclosing these conflicting and competitive interests, the offering materials created the false impression that neither Nini nor CEMS were aware of any material conflicts and competitive interests or that no such conflicts or competitive interests existed.

84.     At the time of these representations, CEMS knew that Nini and CEMS had existing, material conflicts and/or directly competitive interests.

85.     CEMS deliberately withheld, or recklessly failed to disclose, this material information with the intent to induce Plaintiffs to purchase memberships in CEJ that they would not have purchased if CEMS had disclosed these conflicts and competitive interests.

86.     Plaintiffs in fact relied on these omissions and misrepresentations and, as a result, purchased memberships in CEJ.

87.     As a direct and proximate result of CEMS's failure to disclose Nini's conflicting and competitive interests, Plaintiffs suffered damages amounting to a total loss of their investment.

88.     CEMS's course of conduct in offering and selling the memberships in CEJ, as described in the previous paragraphs of this Complaint, constituted a manipulative or deceptive devise or contrivance in violation of section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT V
(Exchange Act § 20(a) against Richard Nini)

89.     Plaintiffs re-allege and incorporate all of the allegations set forth in paragraphs 1 through 88 as if fully rewritten herein.

90.     Defendant Richard Nini was, at all relevant times, the majority shareholder, President and CEO of CEMS.

91.     By reason of his majority status and management position with CEMS, Richard Nini had the power and authority to cause CEMS to engage in the wrongful conduct described herein.

92.     In this capacity, Richard Nini did in fact cause CEMS to engage in the wrongful conduct described herein and was a Controlling Person within the meaning of § 20 of the Exchange Act.

93.     As a Controlling Person, Richard Nini is jointly and severally liable with and to the same extent as Defendant CEMS is liable to Plaintiffs as a result of the wrongful conduct described herein.

**COUNT VI**
(Michigan Uniform Securities Act § 450.810(a)(2) against CEMS)

94.     Plaintiffs re-allege and incorporate all of the allegations set forth in paragraphs 1 through 93 as if fully rewritten herein.

95.     CEMS's course of conduct as described in paragraphs 1 through 94, constituted a violation of Mich. Comp. Laws § 451.810(a)(2).

**COUNT VII**
(Michigan Uniform Securities Act § 450.810(b) against Richard Nini)

96.     Plaintiffs re-allege and incorporate all of the allegations set forth in paragraphs 1 through 95 as if fully rewritten herein.

97.     Defendant Richard Nini was, as CEMS's President and CEO, at all relevant times, a controlling person within the meaning of § 410(b) of the Michigan Uniform Securities Act.

98.     As a controlling person, Richard Nini is jointly and severally liable with and to the same extent as CEMS is to one or more Plaintiffs as a result of the wrongful acts described herein.

**COUNT VIII**
(Florida Securities and Investor Protection Act § 517.301 against CEMS)

99.     Plaintiffs re-allege and incorporate all of the allegations set forth in paragraphs 1 through 98 as if fully rewritten herein.

100.     CEMS's course of conduct in offering and selling the memberships in CEJ, as described in paragraphs 1 through 99, constituted a violation of Fla. Stat. § 517.301.

**COUNT IX**
(Florida Securities and Investor Protection Act § 517.211 against Richard Nini)

101.    Plaintiffs re-allege and incorporate all of the allegations set forth in paragraphs 1 through 100 as if fully rewritten herein.

102.    Defendant Richard Nini, in his capacity as the President and CEO of CEMS, personally participated or aided in making the sale of CEJ memberships in violation of the Florida Securities and Investor Protection Act § 517.301.

103.    Under the Florida Securities and Investor Protection Act § 517.211, Richard Nini is jointly and severally liable with and to the same extent as CEMS is to one or more Plaintiffs as a result of the wrongful acts described herein.

**COUNT X**
(Illinois Securities Law of 1953 § 12 against CEMS)

104.    Plaintiffs re-allege and incorporate all of the allegations set forth in paragraphs 1 through 103 as if fully rewritten herein.

105.    CEMS's course of conduct in offering and selling the memberships in CEJ, as described in paragraphs 1 through 104, constituted a violation of 815 Ill. Comp. Stat. § 5/12.

**COUNT XI**
(Illinois Securities Law of 1953 § 13 against Nini)

106.    Plaintiffs re-allege and incorporate all of the allegations set forth in paragraphs 1 through 105 as if fully rewritten herein.

107.    Defendant Richard Nini, in his capacity as the President and CEO of CEMS, personally participated or aided in making the sale of CEJ memberships in violation of 815 Ill. Comp. Stat. § 5/12.

108.    Under the Illinois Securities Law of 1953 § 13(a), Richard Nini is jointly and severally liable with and to the same extent as CEMS is to one or more Plaintiffs as a result of the wrongful acts described herein.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court

1.    Enter a judgment against Defendant CEMS in an amount sufficient to fully compensate Plaintiffs for CEMS's breaches of its fiduciary duties in Counts I-III, together with interest, costs and reasonable attorneys' fees.

2.    Order CEMS to provide an accounting of all assets, liabilities, and interests belonging to CEJ.

3.    Enter a judgment against Defendant CEMS in an amount sufficient to fully compensate Plaintiffs for CEMS's violation of Section 10(b) of the Exchange Act and Rule 10b-5, together with interest, costs, and reasonable attorneys' fees.

4.    Enter a judgment against Defendant Nini personally in an amount sufficient to fully compensate Plaintiffs for his violation of Section 20(a) of the Exchange Act, together with interest, costs, and reasonable attorney fees.

5.    Enter a judgment against Defendant CEMS for its violation of the Michigan Uniform Securities Act § 450.810(a)(2) in the amount Plaintiffs paid for each membership in CEJ, together with interest at 6% per year from the date of payment, costs, and reasonable attorneys' fees.

6.    Enter a judgment against Defendant Nini personally for his violation of the Michigan Uniform Securities Act § 450.810(b) in the amount Plaintiffs paid for each

membership in CEJ, together with interest at 6% per year from the date of payment, costs, and reasonable attorneys' fees.

7.      Enter a judgment against Defendant CEMS in an amount sufficient to fully compensate Plaintiffs for its violation of the Florida Securities and Investor Protection Act § 517.301, together with interest, costs, and reasonable attorneys' fees.

8.      Enter a judgment against Defendant Nini personally in an amount sufficient to fully compensate Plaintiffs for his violation of the Florida Securities and Investor Protection Act § 517.211, together with interest, and reasonable attorneys' fees.

9.      Enter a judgment against Defendant CEMS for its violation of the Illinois Securities Law of 1953 § 12 in the amount Plaintiffs paid for each membership in CEJ, together with interest at 10% per year from the date of payment, costs, and reasonable attorneys' fees.

10.     Enter a judgment against Defendant Nini personally for his violation of the Illinois Securities Law of 1953 §§ 12 and 13 in the amount Plaintiffs paid for each membership in CEJ, together with interest at 10% per year from the date of payment, costs, and reasonable attorneys' fees.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: _____

Richard C. Sanders (P25210)
P. Rivka Schochet (P52921)
Michael C. Simoni (P70042)
Attorneys for Plaintiffs
150 West Jefferson, Suite 2500
Detroit, MI  48226
(313) 963-6420
Dated: July 2, 2009                    sanders@millercanfield.com