# EXHIBIT E

**OPERATING AGREEMENT**
**FOR**
**CORPORATE EAGLE JET, LLC**
**A Michigan Limited Liability Company**

THE INTERESTS DESCRIBED AND REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "ACT") OR ANY APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND ARE RESTRICTED SECURITIES AS THAT TERM IS DEFINED IN RULE 144 UNDER THE ACT. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR QUALIFICATION UNDER THE ACT AND APPLICABLE STATE ACTS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE ACT AND APPLICABLE STATE ACTS, THE AVAILABILITY OF WHICH IS TO BE ESTABLISHED TO THE SATISFACTION OF THE COMPANY, DEFINED HEREIN.

**INDEX**
**TO**
**OPERATING AGREEMENT**
**FOR**
**CORPORATE EAGLE JET, LLC**

ARTICLE I - ORGANIZATION ........................................................................................... 1
    1.1    Formation of Limited Liability Company ..................................................... 1
    1.2    Purpose.......................................................................................................... 1
    1.3    Power ............................................................................................................ 1
    1.4    Term.............................................................................................................. 2
    1.5    Principal Place of Business .......................................................................... 2
    1.6    Registered Office and Agent ........................................................................ 2
    1.7    Initial Membership ....................................................................................... 2
    1.8    Status of Entity............................................................................................. 2

ARTICLE II - CAPITALIZATION ...................................................................................... 3
    2.1    Initial Capital Contributions of Members ................................................... 3
    2.2    Liability for Contributions........................................................................... 3
    2.3    Enforcement of Obligation to Contribute Capital........................................ 3
    2.4    Additional Funding....................................................................................... 3
    2.5    Membership Interest, Percentage Interests.................................................. 5
    2.6    Capital Accounts........................................................................................... 6
            2.6.1    Increases to Capital Account.......................................................... 7
            2.6.2    Decreases to Capital Account ........................................................ 7
    2.7    Contributions of Promissory Note................................................................ 7
    2.8    Distribution of Assets in Kind...................................................................... 8
    2.9    Transfer of Membership Interest.................................................................. 8
    2.10   Return of Capital .......................................................................................... 8
    2.11   Timing of Determination.............................................................................. 8
    2.12   Interest.......................................................................................................... 8

ARTICLE III - ALLOCATIONS, DISTRIBUTIONS, AND TAX ELECTIONS ............................ 8
    3.1    Partnership Tax Treatment ........................................................................... 8
    3.2    Allocation of Profits and Losses .................................................................. 8
    3.3    Definition of Net Cash Flow ........................................................................ 9
    3.4    Distribution of Net Cash Proceeds............................................................... 9
    3.5    Tax Allocations for Contributed Property.................................................. 10
    3.6    Book Accounts ........................................................................................... 10
    3.7    Adjustments upon Liquidation ................................................................... 10
    3.8    Special Allocation Provisions .................................................................... 11
            3.8.1    Special Allocation of Losses Creating Negative Capital Accounts .............. 11
            3.8.2    Qualified Income Offset............................................................... 11
    3.9    Minimum Gain ........................................................................................... 11

3.10    Minimum Gain Chargeback ...................................................................12
3.11    Curative Allocations .............................................................................12
3.12    Tax Matters Member ............................................................................13

ARTICLE IV - MEMBERS ..............................................................................13
4.1     Action by Members Without a Meeting .................................................13
4.2     Limitation on Authority of Members .....................................................13
        4.2.1   Member Not an Agent ..............................................................13
        4.2.2   No Authority ...........................................................................14
        4.2.3   Expenditures............................................................................14
        4.2.4   Indemnification .......................................................................14

ARTICLE V – MANAGEMENT AND OPERATIONS.....................................14
5.1     Management ..........................................................................................14
5.2     Compensation; Reimbursement .............................................................16
5.3     Compensation ........................................................................................17
5.4     Transactions with Affiliates ..................................................................17
5.5     Other Activities Permitted.....................................................................17
5.6     Failure to Take Action...........................................................................17
5.7     Standard of Care, Liability ....................................................................18
5.8     Separateness of the Company.................................................................18
5.9     Acknowledgement of and Consent to Fees.............................................18

ARTICLE VI – LIMITATION OF LIABILITY; INDEMNIFICATION; INSURANCE.................18
6.1     Limitation of Liability ...........................................................................18
6.2     Liability of Member to the Company......................................................19
6.3     Indemnification......................................................................................19
        6.3.1   Indemnification .......................................................................19
        6.3.2   Advance on Indemnification.....................................................20
        6.3.3   Authorization to Indemnify......................................................20
6.4     Liability Insurance .................................................................................20

ARTICLE VII - TRANSFER OF INTERESTS ..................................................21
7.1     Restrictions on Transfer ........................................................................21
7.2     Rights of Assignee..................................................................................22
        7.2.1   Death, Dissolution or Incompetency of Member .........................22
        7.2.2   Voluntary Transfer ...................................................................22
        7.2.3   Incompetency of Member ..........................................................22
        7.2.4   Transfer Resulting from Bankruptcy, Attachment or Judicial Order............23
7.3     Section 754 Election...............................................................................23
7.4     No Right of Withdrawal .........................................................................23
7.5     Single Representative to Act on Behalf of Successors .............................23
7.6     Lifetime Transfers .................................................................................24
7.7     Payment Terms ......................................................................................24
7.8     Date of Closing......................................................................................25

ARTICLE VIII - DISSOLUTION.................................................................25
   8.1    Events Causing Dissolution ..........................................................25
   8.2    Cessation of Business.....................................................................25
   8.3    Winding Up, Liquidation and Distribution of Assets.....................25
            8.3.1   Liquidating Member ..........................................................25
            8.3.2   Accounting ........................................................................25
            8.3.3   Assets Sold ........................................................................26
            8.3.4   Allocation ..........................................................................26
            8.3.5   Liabilities..........................................................................26
            8.3.6   Reserves............................................................................26
            8.3.7   Distribution........................................................................26
   8.4    Certificate of Dissolution ..............................................................27
   8.5    Post Dissolution Actions ................................................................27
   8.6    Return of Contribution Nonrecourse to Other Members..................27

ARTICLE IX - ARBITRATION .................................................................27
   9.1    Arbitration.......................................................................................27
   9.2    Award; Enforcement ......................................................................28
   9.3    Governing Law, Jurisdiction ..........................................................28
   9.4    Specific Performancè; Injunctive Relief .......................................28

ARTICLE X - MISCELLANEOUS ............................................................29
  10.1   Security Law Restrictions...............................................................29
  10.2   Tax and Fiscal Years ......................................................................30
  10.3   Books of Account and Records.......................................................30
  10.4   Tax Returns and Financial Reports .................................................30
  10.5   Bank Accounts and Investment of Funds........................................30
  10.6   Consent of Member .......................................................................30
  10.7   Covenant to Sign Documents .........................................................30
  10.8   Notices ...........................................................................................31
            10.8.1 Requirement of a Writing; Permitted Methods of Delivery...........31
            10.8.2  Addressees and Addresses .........................................31
            10.8.3  Effectiveness of a Notice ..........................................32
  10.9   Headings .........................................................................................33
  10.10  Complete Agreement; Severability ................................................33
  10.11  Default; Waiver .............................................................................33
  10.12  No Third Party Beneficiaries..........................................................34
  10.13  Binding Effect of Agreement .........................................................34
  10.14  Counterparts...................................................................................34
  10.15  Amendments...................................................................................34
  10.16  Distributions ..................................................................................34
  10.17  Conflicts of Interest .......................................................................35
  10.18  Assignment ....................................................................................35
  10.19  Time for Performance.....................................................................36
  10.20  Rights and Remedies; Remedies Not Exclusive.............................36
  10.21  Survival..........................................................................................36

10.22   Indemnification ............................................................................................................ 36

## OPERATING AGREEMENT
## FOR
## CORPORATE EAGLE JET, LLC

THIS OPERATING AGREEMENT ("AGREEMENT"), made this <u>17th</u> day of <u>July</u> 20<u>07</u>, effective June 23, 2006, between Tradewinds Aviation, Inc., a Michigan corporation ("Tradewinds"), Robert Skandalaris, Holdon f/b/o David L. Hayes Custodial IRA, Al Air, LLC, Air Banks LLC, Don DeFosset, Windsong LLC, MJK Family LLC, <u>Mark II Aviation, LLC</u>, <u>S4Air LLC</u>, and <u>Convenienso, LLC</u> are hereinafter individually referred to as "Member" and collectively as "Members") and Corporate Eagle Jet, LLC, a Michigan limited liability company ("Company").

### WITNESSETH:

WHEREAS, The Company was formed on June 23, 2006; and

WHEREAS, The parties to this Agreement desire to set forth in this Agreement the entire agreement with respect to the capitalization, operation and management of the Company and the rights and duties of the members of the Company, including current and future members of the Company.

NOW, THEREFORE, It Is Agreed:

### ARTICLE I - ORGANIZATION

1.1     <u>Formation of Limited Liability Company</u>.  A limited liability company named Corporate Eagle Jet, LLC, has been formed by the filing of Articles of Organization with the Michigan Department of Labor and Economic Growth, Corporation Division, on June 23, 2006 ("Articles").  Except as otherwise expressly provided in this Agreement, the rights and liabilities of the Members and the administration of the affairs of this Company shall be as provided in the Michigan Limited Liability Company Act, as the same may be amended from time to time ("Act").

1.2     <u>Purpose</u>.  The sole purpose of the Company is to (i) acquire from Tradewinds one thousand three hundred eighty-seven (1,387) of newly issued and outstanding shares of the capital stock of Tradewinds ("TRA Interest"), (ii) purchase a previously owned Raytheon Hawker 800XP aircraft ("Aircraft"), (iii) upgrading and refurbishing the Aircraft, (iv) transferring ownership interest in the Aircraft to single purpose limited liability company (the "SPE"), (v) selling and/or leasing the interests of the SPE in quarter or one-eighth incremental shares ("Shares") (Sections 1.2(ii), (iii), (iv) and (v) are collectively referred to as the "Process"), and (vi) repeat the Process once the last Share is sold or leased.

1.3     <u>Power</u>.  In furtherance of the purpose of the Company, but subject to the provisions of this Agreement, the Company shall be empowered, to do the following acts:

1

    (i)  To execute and enter into any and all documents and to take any and all actions as may be necessary to cause the Company to purchase the TRA Interest;

    (ii)  To execute and enter into any and all documents and to take any an all actions as may be required to cause the Company to set-up the SPEs;

    (iii)  To execute and enter into any and all documents and to take any an all actions as may be required to complete and repeat the Process;

    (iv)  To enter into, execute, acknowledge, deliver, perform, and carry out all such contracts and instruments as may be necessary or appropriate to carry out its purpose;

    (v)  To borrow or raise money and issue evidences of indebtedness and to mortgage, assign, secure or otherwise encumber any or all of the assets of the Company;

    (vi)  To collect funds owed to the Company, pay expenses incurred by or for the Company, and distribute funds from the Company to the Members; and

    (vii)  To have the authority to do any and all acts and things necessary, appropriate, advisable or convenient for the furtherance and accomplishment of the business purposes of the Company, so long as said activities and obligations may be lawfully engaged in or performed by a limited liability company under the Act.

  1.4  <u>Term</u>. The Company shall be deemed to commence upon the effective date of this Agreement and shall continue in existence for the period fixed in the Articles for the duration of the Company or until the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or this Agreement.

  1.5  <u>Principal Place of Business</u>. The principal place of business of the Company shall be at Oakland County International Airport, 6320 Highland Road, Waterford, Michigan 48327, or at such other place as the Manager may from time to time determine in accordance with this Agreement.

  1.6  <u>Registered Office and Agent</u>. The agent for service of process shall be Richard M. Nini, whose business address is Oakland County International Airport, 6320 Highland Road, Waterford, Michigan 48327. If the agent or agent's address is changed, the agent shall file a report of such change with the Michigan Department of Labor and Economic Growth, Corporation Division, and mail a copy of the report to the Company as prescribed by the Act.

  1.7  <u>Initial Membership</u>. The names and addresses of the initial Members of the Company are as set forth on Schedule A attached hereto and made a part hereof.

  1.8  <u>Status of Entity</u>. The Members specifically intend and agree that the Company not be a partnership (including a limited partnership) except for tax purposes or any other venture but a limited liability company under and pursuant to the Act. No Member shall be construed to be a partner in the Company or a partner of any other Member, or person, and the Articles, this Agreement and the relationships created thereby and arising therefrom shall not be construed to suggest otherwise.

## ARTICLE II - CAPITALIZATION

2.1    Initial Capital Contributions of Members.  Upon execution of this Agreement, each Member agrees to make a capital contribution to the Company of the type and the agreed value as set forth on Schedule A ("Capital Contribution").  In the case of Capital Contributions other than cash, Schedule A will identify the gross asset value of such contribution, as well as the federal income tax basis of such asset.

2.2    Liability for Contributions.  Each Member is obligated to the Company to perform any enforceable promise to contribute cash or property or to perform services, even if such Member is unable to perform because of death, disability or any other reason.  If a Member does not make the required contribution of property or services, such Member shall be obligated at the option of the Company to contribute cash equal to that portion of the value, as stated in the records of the Company, of such contribution that has not been made.

2.3    Enforcement of Obligation to Contribute Capital.  In the event any Member ("Delinquent Member") fails to make his Capital Contribution pursuant to the written notice to such Member under Section 2.1, the Delinquent Member shall be given a written notice of default.  If the Delinquent Member fails to cure within thirty (30) days of the date of such written notice of default, the Company may take whatever action it deems appropriate, including but not limited to, enforcing the obligation to make the Capital Contribution in a court of appropriate jurisdiction in the county in which the principal office of the Company is located.  Each Member expressly agrees to the jurisdiction of such court.  The amount of the default shall include the principal amount of the required Capital Contribution, interest on such amount accruing from the date the contribution was due at a default interest rate equal to the bank prime lending rate as reported by the Wall Street Journal, adjusted annually, plus three percent (3%) ("Default Interest Rate"), together with all costs and attorney's fees required to enforce the payment of the amounts described herein.  In the alternative, and in the sole and absolute discretion of the Manager, the Percentage Interests of the Members shall be adjusted as provided in Section 2.5.3 upon the occurrence of a Member's failure to make a Capital Contribution.

2.4    Additional Funding.  In the event the Manager determines that the Company requires funding ("Required Funds") in excess of the initial Capital Contributions, cash generated from operations or other additional capital contributions ("Additional Capital Contributions"), if any, in order to conduct the Company's business, including the maintenance of adequate working capital and reserves, such Required Funds may be obtained by the Manager from the proceeds of loans and/or from other Additional Capital Contributions in accordance with the following:

2.4.1    The Manager from time to time may obtain loans on behalf of the Company from commercial lending institutions, individuals, private firms, corporations or other entities on commercially reasonable terms ("Lending Institution") in such manner (including the engagement of brokers and/or investment bankers to assist in providing such financing) and pursuant to such terms, provisions and conditions as the Manager shall determine.  No personal guaranties shall be required of the Members in respect of any loan obtained for the Company by the Manager from a Lending Institution.  If any Member who guarantees a Lending Institution's loan to or for the benefit of the Company is required to pay under any such guaranty, subject to

3

the terms of the guaranty, such paying Member shall be subrogated to the rights of the Lending Institution and such paying Member shall not have a right of contribution from any other Member.

2.4.2 Additionally, or alternatively as the Manager deems appropriate in its sole and absolute discretion, the Company, from time to time, may borrow Required Funds (or any portion thereof) from any Member or Members who agree to lend money to the Company; provided that, upon the occasion of each such borrowing of Required Funds from a Member or Members, each Member shall have the right to loan the Company a pro-rata portion of such Required Funds equal to the result obtained by multiplying such Member's Percentage Interest by the amount of such Required Funds. If a Member declines to loan such Member's pro-rata share of the Required Funds (a "Declining Member"), resulting in an amount (the "Loan Shortfall Amount") of such loans to be less than the desired amount of the Required Funds, the Member who exercised its right to loan the Company its pro-rata portion of such Required Funds shall be offered the right to loan the Company all or a portion of the Loan Shortfall Amount. The time limitations and process related to the exercise of the foregoing rights shall be as determined by the Manager in its sole and absolute discretion upon consideration of the needs of the Company.

2.4.3 Members are under no obligation whatsoever to make any loan or advance to the Company. If any Member shall make any loan to the Company, or advance money on the Company's behalf, the amount of any such loan or advance shall not be an increase in the capital account of the lending Member, nor entitle such lending Member to any increase in such Member's share of the distributions of the Company or subject such Member to any greater portion of the losses that the Company may sustain. The amount of any such loan or advance shall be a debt due from the Company to such lending Member. All such loans or advances (i) shall be evidenced by written documentation, (ii) shall be secured or unsecured as the parties may agree, (iii) shall be repayable, pro rata, on such terms and conditions as shall be commercially reasonable and mutually agreed upon by the lending Member and the Manager and (iv) shall be paid before any distributions are paid to the Members.

2.4.4 Additionally, if the Members unanimously deem it appropriate, the Company may request the Members to make Additional Capital Contributions in the amount of all or a portion of the Required Funds (a "Capital Call"); provided that upon the occasion of each such Capital Call, each Member shall have the right to contribute to the Company a pro-rata portion of the Required Funds equal to the result obtained by multiplying such Member's Percentage Interest by the amount of the Required Funds. If a Member fails to so contribute, such Member's pro-rata share of the Required Funds (a "Non-Contributing Member") resulting in an amount (the "Contribution Shortfall Amount") of such Additional Capital Contributions to be less than the required amount of the Required Funds, then the Member who exercised its right to contribute its pro-rata portion of the Required Funds shall be offered the right to make up all or a portion of the Contribution Shortfall Amount. Each Member who makes an Additional Capital Contribution ("Contributing Member") shall be deemed to have made a Capital Contribution to the Company in the amount of the Additional Capital Contribution paid by such Contributing Member. The time limitations and process related to the exercise of the foregoing rights shall be as determined by the Manager upon consideration of the needs of the Company.

Upon receipt of Additional Capital Contributions pursuant to a Capital Call, the Percentage Interests of the Members shall be adjusted as provided in Section 2.5.3. The Manager may elect not to accept on behalf of the Company any Additional Capital Contributions unless the entire amount of the Required Funds is contributed in the aggregate by the Members in accordance with this Section 2.4.4.

      2.4.5   The provisions of Section 2.4 are not intended to be for the benefit of any creditor or other person (other than a Member in such Member's capacity as such) to whom any debts, liabilities or obligations are owed by, or who has a claim against, the Company or any Member, and no such creditor or other person shall obtain any rights under Section 2.4 against the Company or any Member.

    2.5    <u>Membership Interest; Percentage Interests.</u>

      2.5.1   The term "Membership Interest" means, with respect to each Member, such Member's right to the allocations (and each item thereof) and distributions from the Company as specified in this Agreement, together with all other rights, duties and obligations of such Member as specified in this Agreement and the Act; provided that in the event of any conflict between the terms of this Agreement and any provision contained in the Act, the terms of this Agreement shall control except as may be specifically prohibited by the Act.

      2.5.2   The term "Percentage Interest" means, with respect to each Member, the respective Percentage Interests set forth on Schedule A, subject in each case to adjustment from time to time when and as provided in Section 2.5.3. In all cases, Percentage Interests shall be stated to four decimal places, and from time to time as Percentage Interests change, the Manager shall have the right, in the reasonable exercise of the Manager's discretion, to equitably round off the Percentage Interests of the various Members so that the sum of the Percentage Interests of all Members, equals one hundred percent (100%).

      2.5.3   Upon receipt by the Company of Capital Contributions under Section 2.1, an Additional Capital Contribution under Section 2.4.3 and Guaranty Capital Contributions under Section 2.4.1, the following provisions in regard to adjustments, if any, to the respective Percentage Interests of the Members shall apply:

      2.5.3.1   Upon the occurrence of a Capital Contribution under Sections 2.1 and 2.3:

      (i)    In the event all Members contribute their Capital Contribution as set forth on Schedule A, then no adjustment to the Members' respective Percentage Interests shall be made.

      (ii)    In the event fewer than all Members have contributed their pro-rata share of the Capital Contribution as set forth on Schedule A and in accordance with Sections 2.1 and 2.3, and the Manager elects, in its sole and absolute discretion, to adjust the Percentage Interests of the Members, then the Percentage Interests of those Members who contribute their Capital Contribution shall be increased and the Percentage Interests of those Members who do not contribute their Capital Contribution shall be decreased, so that each

5

Member's Percentage Interest is equal to a fraction, the numerator of which is that Member's total Capital Contribution and the denominator of which is the total Capital Contributions of all Members.

2.5.3.2 Upon the occurrence of a Capital Call under Section 2.4.34:

(i) In the event all Members have contributed their pro-rata share (based on their respective Percentage Interests immediately before such Capital Call) of the total amount of the Required Funds required by such Capital Call, then no adjustments to the Members' respective Percentage Interests shall be made.

(ii) In the event fewer than all Members have contributed their pro-rata share (based on their respective Percentage Interests immediately before the subject Capital Call) of the total amount of the Required Funds required by such Capital Call, then the Percentage Interests of the Contributing Members shall be increased, and the Percentage Interests of the Non-Contributing Members shall be decreased, so that each Member's Percentage Interest is equal to a fraction, the numerator of which is that Contributing Member's Capital Contribution, Additional Capital Contribution and Guaranty Capital Contribution, if any, and the denominator of which is the total Capital Contributions, Additional Capital Contributions and Guaranty Capital Contributions, if any, of all Members.

2.5.4 The Manager is hereby authorized to amend Schedule A to reflect any Capital Contribution and/or Additional Capital Contribution made by a Member in accordance with this Agreement and to reflect any adjustments to a Member's Percentage Interest in accordance with Section 2.5.3. Each Member hereby designates and appoints the Manager of the Company as attorney-in-fact for said Member (with power of substitution) with authority in each case a Member fails to take any action or execute any documents required in connection with the increase/decrease of a Member's Percentage Interest, for and in the name of such Member. This power of attorney shall be construed as a durable power of attorney, not affected by the disability of the party granting the power, for purposes of executing such documents. This power of attorney being coupled with an interest is irrevocable.

2.6 Capital Accounts. The Company shall establish and maintain a capital account for each Member determined from the inception of the Company strictly in accordance with Section 704 of the Internal Revenue Code ("Code") and the Treasury Regulations thereunder ("Treasury Regulations") and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Manager shall determine that it is prudent to modify the manner in which Member capital accounts are computed in order to comply with the Treasury Regulations, the Manager may make such modification, provided that such modification is not likely to have a material adverse effect on the amounts distributable to any Member pursuant to this Agreement and the Manager notifies the Members in writing of such modification prior to its effective date. The Manager shall have no liability to any Member for any failure to exercise any such discretion to make any modifications permitted under this subsection.

2.6.1    Increases to Capital Account.  Subject to Section 2.4, each Member's capital account shall be increased by:

(i)    Money Contributed and Company Liability Assumed.  The amount of money contributed by a Member to the Company (which amount shall include any assumption by a Member of any liability of the Company);

(ii)    Property Contributed.  The fair market value of property contributed by a Member to the Company (net of liabilities secured by the contributed property that the Company assumes or takes subject to as determined under the Code); and

(iii)    Allocations of Income and Gain.  Allocations to a Member of the income and gain (or items thereof) of the Company, including income and gain exempt from tax, and in the case of property that is reflected on the books of the Company at a book value that differs from its adjusted basis for federal income tax purposes, solely the amount of income and gain recognized by the Company for book purposes with respect to that property and including income and gain specifically allocated to the Member by virtue of Sections 704 or 705 of the Code.

2.6.2    Decreases to Capital Account.  Each Member's capital account shall be decreased by:

(i)    Cash Distributions and Member's Liability Assumed.  The amount of money distributed to a Member by the Company (which amount shall include any assumption by the Company of any liability of the Member);

(ii)    Property Distributions.  The fair market value of property distributed to a Member by the Company (net of liabilities secured by the distributed property that a Member assumes or takes subject to as determined under the Code);

(iii)    Allocations of Expenditures.    Allocations to a Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code (including for this purpose, losses that are nondeductible under Sections 267[a][1] or 707[b] of the Code);

(iv)    Organization Costs.  A Member's share of amounts paid or incurred by the Company to organize the Company or to promote the sale of (or to sell) a Membership Interest in the Company (except to the extent properly amortized for tax purposes); and

(v)    Allocations of Losses and Deductions.  Allocations to a Member of the losses and deductions (or items thereof) of the Company, including, in the case of property that is reflected on the books of the Company at book value differing from its adjusted basis for federal income tax purposes, solely the amount of losses and deductions recognized by the Company for book purposes with respect to such property and including any loss specifically allocated to the Member by virtue of Sections 704 or 705 of the Code.

2.7    Contributions of Promissory Note.  If a Promissory Note is contributed to the Company by a Member who is the maker of such note, such Member's capital account will be increased with respect to such note only when there is a taxable disposition of such note by the

7

Company or when the Member makes principal payments on such note (and then only in the amount of such principal payments).

2.8     Distribution of Assets in Kind.   A Member, irrespective of the nature of the Member's capital contribution, only has the right to demand and receive cash in return for such capital contribution.

2.9     Transfer of Membership Interest.   In the event of any permitted Transfer, defined herein, of a Membership Interest, the substituted Member shall have a capital account equal to the capital account of the transferring Member (or proportion thereof in the case of a Transfer of less than all of such Member's Membership Interest) as of the date of such Transfer in accordance with Section 1.704-1(b)(2) of the Treasury Regulations.

2.10     Return of Capital.   No specific time has been agreed upon for the repayment of capital contributions of Members, and no requirement is imposed on the Company to make or cause any such repayment. Provided there are assets which at fair market value are sufficient to pay all liabilities of the Company, a return of capital may be made by the Manager at its sole discretion and, except as otherwise provided herein, any such return shall be made in proportion to the Percentage Interest held by each Member. Except as otherwise provided herein, no Member or Transferee shall have priority over any other Member or Transferee, either as to the return of capital contributions or as to net profits, net losses or distributions; provided that this Section shall not apply to loans (as distinguished from capital contributions) that a Member has made to the Company. No Member shall be required to pay to the Company or to any other Member or person any deficiency in such Member's capital account upon dissolution of the Company or otherwise.

2.11     Timing of Determination.   Whenever it is necessary to determine the capital account of any Member, the capital account of the Member shall be determined after giving effect to the allocation for the Company's current year's Profits and Losses, defined herein, and all distributions for such year for transactions occurring prior to the date such determination is to be made pursuant to the terms of this Agreement.

2.12     Interest.   No interest shall be paid on any capital contribution to the Company.

## ARTICLE III - ALLOCATIONS, DISTRIBUTIONS, AND TAX ELECTIONS

3.1     Partnership Tax Treatment.   Any provision in this Agreement to the contrary notwithstanding, it is intended that the Company shall be taxed as a partnership for federal and state income tax purposes, and the Company shall comply with all provisions of the Code consistent with such intent including, but not limited to, compliance with Section 704 of the Code.

3.2     Allocation of Profits and Losses.   Except as may be required (i) by Section 704 of the Code, (ii) by the Treasury Regulations thereunder or (iii) by any other provisions of this Article III or this Agreement, net profits, net losses, and other items of income, gain, loss, deduction and credits for federal income tax purposes including any profits, losses or gains not taken into account for federal income tax purposes ("Profits and Losses") shall be apportioned among the Members in proportion to their Percentage Interest as set forth in Schedule A, as amended from time to time. Notwithstanding anything contained herein to the contrary, all Profits and Losses shall be allocated

8

in accordance with the Treasury Regulations so that such allocations comport with the economic intent of the Members of the Company.

3.3     Definition of Net Cash Flow. As used herein, the term "Net Cash Flow" of the Company shall mean the taxable income of the Company for federal income tax purposes as shown on the books of the Company (excluding therefrom any net proceeds resulting from the refinancing, sale, condemnation or other disposition of all or substantially all of the property of the Company), adjusted for the following additions to and deductions from taxable income:

        3.3.1   Additions to taxable income:

                (i)     The amount of depreciation and/or amortization, other non-cash charges, and all accrued expenses deducted in computing such taxable income;

                (ii)    All other receipts of the Company not included in taxable income (exclusive of capital contributions, the proceeds of capital loans, net cash proceeds and similar receipts); and

                (iii)   Any other funds, including accrued interest, deemed available for distribution and designated as Net Cash Flow by the Manager, including any amounts previously set aside as reserves by the Manager that the Manager deems no longer necessary for the operation of the Company business.

        3.3.2   Deductions from taxable income:

                (i)     The principal payments on all Company indebtedness;

                (ii)    Expenditures for the acquisition of property and for capital improvements or replacements (except to the extent financed by contributions of capital to the Company or by loans to the Company for such purposes); and

                (iii)   Other non-tax deductible cash expenditures of the Company and such reserves established by the Manager, in his discretion, for the operation of the Company business.

3.4     Distribution of Net Cash Proceeds. Distributions may be made only after the Manager determines, in its sole and absolute discretion, that the Company has sufficient cash on hand which exceeds the current and the anticipated needs of the Company to fulfill its business purposes (including needs for operating expenses, debt service, acquisitions, reserves and mandatory distributions, if any). For purposes of this Section 3.4, Three Million and 00/100 Dollars ($3,000,000.00) is sufficient cash on hand for the annual needs of the Company to fulfill its business purposes. Distributions shall be in cash or property or partially in both. No distribution shall be declared or made if, after giving it effect, the Company would not be able to pay its debts as they become due in the usual course of business or the Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of the Members upon dissolution that are superior to the rights, if any, of the Members receiving the

distribution. Additionally, the Manager shall distribute among the Members, in accordance with Section 3.4(iii) herein, the Net Cash Flow resulting from the financing of any mortgage on, or the sale, exchange, condemnation (or similar eminent domain taking), casualty or other disposition of all, or substantially all of the property of the Company ("Net Cash Proceeds"), in the following order of priority (which shall reflect the allocations in Section 3.5 herein):

   (i) First, to the payment of the debts and liabilities of the Company (except the debts creating the proceeds resulting from financing);

   (ii) Second, to a reserve fund in an amount which the Manager deems necessary to provide for any contingent or unforeseen liabilities of the Company; provided, however, that at the expiration of such reasonable period of time as the Manager deems advisable, the balance of such reserve fund established herein remaining after the payment of any such contingency or liability shall be distributed in the manner provided in Section 3.4(iii); and

   (iii) Third, the balance to the Members pro rata in proportion to their respective Percentage Interests.

  3.5 <u>Tax Allocations for Contributed Property</u>. In accordance with Code Section 704 and applicable Treasury Regulations, Profits and Losses with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such property to the Company for federal income tax purposes and the value ascribed to it under this Agreement. In addition, in the event the value of any Company asset is required to be adjusted pursuant to the provisions of Section 704(b) of the Code and the Treasury Regulations thereunder, subsequent allocations of Profits and Losses for tax purposes with respect to such asset shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its adjusted value in the same manner as under Section 704(c) (Traditional Allocation Method) and the applicable Treasury Regulations. Any elections or other decisions relating to such allocations shall be made in a manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section are solely for purposes of federal, state, and local taxes, as appropriate, and shall not affect, or in any way be taken into account in computing, any Member's capital account or share of Profits and Losses, and other items, or distributions pursuant to any provision of this Agreement.

  3.6 <u>Book Accounts</u>. For purposes of determining capital accounts hereunder, "income" refers to all items of income (including all items of gain and including income exempt from tax) as properly determined for "book" purposes, and "loss" refers to all items of loss (including deductions) as properly determined for "book" purposes. "Book" income and loss shall be determined based on the value of the Company assets as set forth on the books of the Company in accordance with the principles of Section 1.704(b)(2)(iv)(g) of the Treasury Regulations. Otherwise, income and loss shall be determined strictly in accordance with federal income tax principles (including rules governing depreciation and amortization), applied hypothetically based on values of the Company's assets as set forth on the Company books.

  3.7 <u>Adjustments Upon Liquidation</u>. In the event of the actual liquidation of the Company, capital accounts shall be adjusted for the "book" gain or loss that would have been

realized by the Company if all of its assets had been sold for their fair market values in a cash sale (in order to reflect unrealized gain or loss). Capital accounts also shall be adjusted upon the constructive termination of the Company as provided under Section 708 of the Code in accordance with the method set forth in the immediately preceding sentence.

      3.8    <u>Special Allocation Provisions</u>. Notwithstanding the regular allocation provisions set forth above, the following special allocations shall be made if such provisions shall become applicable. The Members intend that the provisions set forth in this Section will constitute a "qualified income offset" as required by Treasury Regulation Section 1-704(b)(2)(ii)(d) and will meet the alternate test for economic effect set forth therein. Those Treasury Regulations shall control in the case of any conflict between those regulations and this Section.

      3.8.1    <u>Special Allocation of Losses Creating Negative Capital Accounts</u>. Notwithstanding any other provisions of this Article III, no allocation of losses or deductions may be made to a Member if such allocation would cause or increase a deficit balance in such Member's capital account as of the end of the Company's taxable year to which such allocation relates, taking into consideration reductions in the Member's capital account in the manner prescribed by Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations. Any allocation of losses or deductions (or portions thereof) disallowed to a Member pursuant to this Section shall be specially allocated to Members with positive capital account balances, pro rata, in proportion to such positive capital account balances, or if no such Members exist, then to Members in accordance with their interests in Company profits. Furthermore, if one or more Members are specially allocated losses or deductions pursuant to this Section, there subsequently shall be specially allocated to such Members, profits in an amount equal to such losses or deductions previously specially allocated to such Members under this Section.

      3.8.2    <u>Qualified Income Offset</u>. If a Member unexpectedly receives an allocation or distribution described in Sections 1.704-(1)(b)(2)(ii)(d)(4), (5), or (6) of the Treasury Regulations and such unexpected allocation or distribution of items creates or increases a deficit balance in the Member's capital account, then such Member shall be allocated items of Company income and gain in an amount and manner as set forth in the Treasury Regulations sufficient to eliminate the deficit balance in such Member's capital account created by such allocation or distribution as quickly as possible. Any special allocations pursuant to this Section shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to this Article III, so that the net amount of any items so allocated and the Profits and Losses, and all other items allocated to each Member pursuant to this Article III, to the extent possible, shall be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article III if such unexpected adjustments, allocations, or distributions had not occurred. Allocations under this Section shall be comprised of a pro-rata portion of each item of Company income (including gross income) and gain for the year (and, if necessary, subsequent years).

      3.9    <u>Minimum Gain</u>. "Minimum Gain" with respect to any taxable year of the Company means the minimum gain of the Company computed strictly in accordance with the principles of Section 1.704-2 of the Treasury Regulations. Generally, said term shall mean the sum of the amounts of taxable income or gain that would be realized by the Company if each Company asset subject to nonrecourse liabilities was disposed of for the amount of nonrecourse liabilities secured by the asset. For this purpose, where the asset is subject to multiple secured

liabilities of unequal priority, the adjusted basis of the asset shall be allocated among the liabilities in order of priority from most senior first to least senior last. Where two or more secured liabilities are of equal priority, basis shall be allocated among the liabilities pro rata in accordance with the amounts of the liabilities. For purposes of computing Minimum Gain, the "book" value of an asset shall be substituted for its adjusted tax basis if the two differ, but otherwise Minimum Gain shall be determined in accordance with federal income tax principles.

3.10   Minimum Gain Chargeback. Notwithstanding any other allocation provisions hereunder to the contrary, in the event that there is a net decrease in the Minimum Gain of the Company during a tax year as defined in Section 1.704-2(d) of the Treasury Regulations, then the capital accounts of each Member shall be allocated items of Company income and gain for the taxable year equal to that Member's share of the net decrease in Company Minimum Gain (as that phrase in defined in Section 1.704-2(g)(2) of the Treasury Regulations. The Members intend that the provision set forth in this Section will constitute a "minimum gain chargeback" as described in Section 1.704-2 of the Treasury Regulations. The Treasury Regulations shall control in the case of any conflict between those regulations and this Section. If, in any taxable year, the Company has a net decrease in the Company's Minimum Gain, and if the Minimum Gain chargeback requirement would cause a distortion in the economic arrangement among the Company and if it is not expected that the Company will have sufficient other income to correct such distortion, the Company may (and shall, if requested to do so by a Member) seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Treasury Regulation Section 1.704-2(f)(4). Items of Company loss, deduction and expenditures described in Section 705(a)(2)(B) which are attributable to any nonrecourse debt of the Company and are characterized as Member (i.e., partner) nonrecourse deductions under Section 1.704-2(i) of the Treasury Regulations shall be allocated to the Members' Capital Accounts in accordance with said Section 1.704-2(i) of the Treasury Regulations. Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions shall be allocated to the Members in the same manner as net profit or net losses are allocated for such period.

3.11   Curative Allocations. The allocations set forth in this Section 3.11 (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations, or with special allocations of other items of Company income, gain, loss or deduction as determined pursuant to this Section. Notwithstanding any other provision of Article III (other than the Regulatory Allocations), offsetting special allocations of Company income, gain, loss or deduction will be made, in whatever manner the Tax Matters Member deems appropriate, so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Article III without regard to the Regulatory Allocations, In exercising its discretion under this Section, the Tax Matters Member will take into account future Regulatory Allocations under this Section 3.11 that, although not yet made, are likely to offset other Regulatory Allocations previously made under this Section 3.11. The Members recognize that the effect of the differing amounts to be taken into account for purposes of the relationship among the Members, for tax accounting and

for financial reporting may mean that three (3) separate statements of the Members' interests in the Company may be maintained by the Company.

3.12   Tax Matters Member. To the extent the designation of a Tax Matters Member or contact for the Company's affairs is necessary, Tradewinds shall be the designated Tax Matters Member for the purposes of Section 6231(a)(7) of the Code. "Tax Matters Member" will have the meaning as ascribed to "tax matters partner" in the Code. The Tax Matters Member is authorized to perform the duties required or appropriate under the applicable provisions of the Code or any applicable tax or related statute and the Treasury Regulations issued pursuant to it, and is responsible for representing the Company and each of the Members before the Internal Revenue Service and any state or local tax authority or any other government agency with respect to any issue related to the Company's tax returns or tax obligations. The Tax Matters Member will be a Member or a member of a Member. The Tax Matters Member will keep the other Members reasonably informed of any Company dealings with any tax authorities or other government agencies. If the Tax Matters Member is no longer a Member, the then Manager will designate a successor Tax Matters Member. Each Member consents to the designation and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence the consent and make the appointment effective. Each Member will be bound by actions of the Member acting as the Tax Matters Member. The Tax Matters Member and the other Members shall use their reasonable efforts to comply with the responsibilities outlined in Sections 6221 through 6233 of the Code (including any Treasury Regulations promulgated thereunder), and in doing so shall incur no liability to the Company or any other Member. All out-of-pocket expenses reasonably incurred by the Tax Matters Member in its capacity as Tax Matters Member will be considered expenses of the Company for which the Tax Matters Member will be entitled to full reimbursement.

## ARTICLE IV - MEMBERS

4.1   Action by Members Without a Meeting. Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting, without prior notice, and without a vote if the action is evidenced by one or more written consents or approvals describing the action taken and signed, by Members representing the requisite amount of Percentage Interests to approve such action had such action been properly voted on at a duly called meeting of the Members. Action taken under this Section is effective when Members with the requisite Percentage Interests have signed the consent or approval, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

4.2   Limitation on Authority of Members.

4.2.1   Member Not an Agent. No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for or on behalf of the Company solely by virtue of being a Member. This Section 4.2.1 supersedes any authority granted to the Members pursuant to Sections 401 or 406 of the Act.

4.2.2 <u>No Authority</u>. No Member has the power or authority to bind the Company or to authorize any action to be taken by the Company, or to act as an agent for the Company, unless that power or authority has been specifically delegated to a Member by the Manager by separate agreement or as expressly provided for in this Agreement.

4.2.3 <u>Expenditures</u>. No Member solely by virtue of being a member is authorized to incur any expenditures on behalf of the Company without the approval of the Manager or except as provided by separate agreement or as expressly provided for in this Agreement.

4.2.4 <u>Indemnification</u>. Any Member who takes any action or binds the Company in violation of Sections 4.2.1 through 4.2.3 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to such loss or expense.

## ARTICLE V – MANAGEMENT AND OPERATIONS

5.1 <u>Management</u>.

5.1.1 Except as otherwise specifically provided in this Agreement, the business and affairs of the Company shall be managed by the Manager and all actions, decisions, determinations, designations, directions, appointments, consents, approvals, selections and the like, to be taken, made, or given by the Members, including, without limitation, a sale, financing, refinancing or lease of any or all of the property of the Company or other sale of the business of the Company irrespective of form (collectively, "Actions and Decisions") shall be taken, made or given by the Manager in its sole and absolute discretion, and all such Actions and Decisions shall be controlling and binding upon the Company and all of the Members. The Manager has the full and exclusive power to manage, control, administer and operate the business and affairs of the Company, to make all decisions affecting the Company, to act for and bind the Company, and to take such actions as the Manager, in the Manager's sole discretion, determines are necessary, convenient, or advisable to carry out the purposes of the Company in compliance with the requirements of fiduciary duty set forth in this Agreement. These powers include but are not limited to the authority to:

5.1.1.1 Finance, purchase, re-sale or accept trade-in aircraft;

5.1.1.2 Purchase, lease, otherwise acquire any real or personal property or services, including from a Manager or a person or entity associated or affiliated with a Manager and including where the acquisition will substantially reduce the liquidity of the Company's assets or will not generate income;

5.1.1.3 Sell, grant an option for the sale of, convey, mortgage, grant a security interest in, grant an easement or license with respect to, pledge, lease, exchange or otherwise dispose or encumber any real or personal property on terms and conditions the Manager deems appropriate at the time of each transaction;

5.1.1.4 Convey, transfer and place record title and other evidence and indicia of ownership of any of the Company's property, or any portion of it, in the name or

14

names of a nominee or nominees for the purpose of financing or for any other purpose of the Company, but only if all Members are given notice of the name and address of the nominee and the description of the asset;

        5.1.1.5      Select and establish bank, depositary, or investment accounts and deposit into and withdraw funds from them on the signature of any Manager or such other person or persons as the Manager may designate and maintain, vote and exercise all other governing or other rights of the Company with respect to such accounts;

        5.1.1.6      Borrow money, including from a Member or any person or entity associated or affiliated with a Member, obtain any means of financing, incur liabilities and approve any loan agreements or documents evidencing debt incurred by the Company;

        5.1.1.7      Negotiate, issue, and modify promissory notes and other debt instruments, negotiable or nonnegotiable, and security for the indebtedness by mortgage, pledge, assignment, letter of credit, reimbursement agreement, guaranty, or other lien on any Company property;

        5.1.1.8      Manage, administer, conserve, improve, develop, operate, lease, utilize and defend the Company's property, directly or through third parties;

        5.1.1.9      Manage the day-to-day business and affairs of the Company;

        5.1.1.10      Select and engage employees and agents, including a successor resident agent, attorneys, accountants, brokers, and other professional, technical, skilled and others, including persons who may be affiliated or associated with a Manager, define their respective duties, and establish their compensation or remuneration;

        5.1.1.11      Obtain insurance covering the business and affairs of the Company and its property and on the lives and well being of its Members, employees and agents;

        5.1.1.12      Commence, prosecute or defend any proceeding in the Company's name and defend and hold harmless any Members against any claim in connection with the Company business other than a claim by another Member for breach of an obligation under this Agreement;

        5.1.1.13      Incur and pay any reasonable expense for travel, telephone, telegraph, insurance, taxes and such other expenses as the Manager deems necessary or appropriate;

        5.1.1.14      Sign any agreements, contracts, documents, certifications, instruments, notes, mortgages, assignments and security agreements necessary or convenient in connection with the operation of the business of the Company; and

        5.1.1.15      Carry out and continue the business, affairs and purposes of the Company as described in this Agreement within and without the state of registration and do such other acts as deemed appropriate to carry out other powers authorized.

5.1.2   The Manager may appoint one or more officers who may, but need not be, Members of the Company, with such titles, duties and compensation as may be designated by the Manager, subject to any applicable restrictions specifically provided in this Agreement or contained in the Act or as may be imposed by the Manager.  The Manager may designate in writing one or more persons (who need not be Members) as authorized signatures of the Company for a specific purpose or transaction, and all legal instruments affecting the Company or Company property with respect to such purpose or transaction need be executed by, and only by, the Manager or that person or those persons so designated in writing by the Manager, and such designated persons signature shall be sufficient to bind the Company and its properties with respect to such matters.

5.1.3   The Manager shall devote such time, attention, and effort to the Company as is reasonably necessary for such management duties.

5.1.4   There shall be one (1) Manager of the Company.  A Manager need not be a Member of the Company.  The initial Manager of the Company shall be Tradewinds, who shall remain the Manager of the Company until such time that Tradewinds is unable or unwilling to so act.  In the event a manager is unable or unwilling to act, then the management of the Company shall be vested in the Members, in proportion to each Member's Percentage Interest, with the decision of the Members owning a majority of the Percentage Interest controlling.  In the event the Company becomes managed by the Members, then a vote of Members owning a majority of the Percentage Interest shall have the right to elect a new manager.

5.1.5   The Members, by their execution and delivery of this Agreement, irrevocably authorize the Manager to do any act that the Manager has the right, power and authority to do under the provisions of this Agreement, without any other or subsequent authorizations, approvals or consents of any kind.  No person dealing with the Company shall be required to investigate or inquire as to the authority of the Manager to exercise the rights, powers, and authority herein conferred upon the Manager.  Any person dealing with the Company shall be entitled to rely upon any action taken and/or any document or instrument executed and delivered by the Manager or a person or persons designated by the Manager, and the Company shall be bound thereby.  No purchaser of any property or interest owned by the Company, or lender to the Company, and no other third party in respect of dealing with the Company shall be required to determine the sole and exclusive authority of the Manager to execute and deliver on behalf of the Company any agreement, any instrument of transfer or security, or any other document or instrument.

5.2   Reimbursement.  The Company will reimburse the Manager for all reasonable out-of-pocket expenses incurred by the Manager in organizing, managing and conducting the Company's business, including but not limited to overhead, legal and accounting fees and costs, expenses related to telephones, travel, office equipment, miscellaneous office administration, and secretarial and other personnel as may reasonably be attributable to the Company, repair, maintenance, broker, other professional and technical expenses, and for defending the Company, its assets or its Members from suit, audit, or other liability created by virtue of the Company or its operations.  The Company may also reimburse any Member who is not a Manager for all such costs and expenses.  All reimbursements will be expenses of the Company and will not constitute distributions to any Member of profit, loss or capital of the Company.

5.3   <u>Compensation</u>.   A Member or a person or entity associated or affiliated with a Member may receive such compensation or guaranteed payment for services rendered to or performed for or on behalf of the Company as shall be commercially reasonable and approved by the Manager. The Manager shall receive a transaction fee of two percent (2%) of the gross value for (i) each sale or lease of the Aircraft Shares or (ii) the U.S. dollar value of the trade-in aircraft.

5.4   <u>Transactions with Affiliates</u>.   The Manager shall have the authority to enter into any transaction with, or to hire, employ or contract with, any individual, partnership, corporation, or entity that is an affiliate of the Manager ("Interested Person") if the terms or conditions of any agreement, contract, or understanding entered into between the Company and an Interested Person are commercially reasonable at the time of execution of the agreement, contract, or understanding. No agreement, contract or understanding entered into between the Company and an Interested Person shall be voidable or affected in any manner by the fact that an Interested Person is directly or indirectly interested in such agreement, contract or understanding apart from its interest as a Member, nor shall any Interested Person be accountable to the Company or the other Members in respect of any profits directly or indirectly realized by said Interested Person by reason of such agreement, contract or understanding.   Notwithstanding the foregoing provisions of this Section 5.4, (i) any direct or indirect interest of an Interested Person in any contract or other act, other than its interest as a Member, shall be disclosed to the Members and (ii) such contract shall contain commercially reasonable terms and market rates.

5.5   <u>Other Activities Permitted</u>.   The Members, the Manager, and their respective affiliates may have interests in other present or future ventures, including ventures that are competitive with the Company, and that, notwithstanding a Member's or the Manager's status as a Member or Manager, as the case may be, a Member, the Manager, and such Member's and Manager's affiliate(s) shall be entitled to obtain and/or continue their individual participation in all such ventures without (i) accounting to the Company or the other Members for any profits with respect thereto, (ii) any obligation to advise the other Members or the Company of business opportunities for the Company which may come to such Member's or such Member's affiliate's attention as a result of such Member's or such Member's affiliate's participation in such other ventures or in the Company, and (iii) being subject to any claims by the Company or any other Member whatsoever on account of such participation. Except as otherwise expressly provided in this Agreement, each Member waives any rights a Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's affiliates.

5.6   <u>Failure to Take Action</u>.   The Manager shall not be liable to the Members for its failure to take any action on behalf of the Company, including, but not limited to, any action that may prevent the foreclosure of all or any portion of the assets of the Company due to the Company's lack of sufficient funds, provided the Manager gives the Members prior notice that the Members may, but shall not be obligated to, contribute sufficient funds if they then desire that the action be taken. Moreover, in the event that after the notice is given, the funds are not contributed to the Company by the Members, the Manager shall have the power, but shall not be obligated (i) to sell all or any portion of the assets of the Company in order to raise the funds or (ii) to cause the dissolution of the Company or the abandonment of any of the assets of the Company.

5.7     Standard of Care; Liability.  The Manager shall discharge its duties in managing the Company in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner reasonably believed to be in the best interests of the Company.

5.8     Separateness of the Company.   The Manager shall take all steps reasonably necessary to insure that the Company will be determined to be a separate entity and will not be consolidated with any other entity, including, but not limited to, the following:

(i)     Maintain books and records of the Company that are separate from the books and records of any other entity;

(ii)    Not commingle the assets or funds of the Company with the assets or funds of any other entity;

(iii)   Cause the Company to conduct its own business in its own name;

(iv)    Prepare and maintain separate tax returns and financial statements for the Company;

(v)     Cause the Company to pay its own liabilities out of its own funds;

(vi)    Cause the Company to observe the legal formalities associated with its legal structure;

(vii)   Not allow the Company to guarantee or become obligated for the debts of any other person and not to pledge its assets for the benefit of any other person;

(viii)  Transact all business with affiliates on an arm's length basis and pursuant to enforceable agreements; and

(ix)    Cause the Company to hold itself out as a separate entity.

5.9     Acknowledgement of and Consent to Fees.  The Members hereby acknowledge that the Company and/or the SPEs will enter into some or all of the following agreements: a Master Dry-Lease Exchange Agreement in the same form as Schedule B, attached hereto and made a part hereof; a Management Agreement in the same form as Schedule C, attached hereto and made a part hereof; and an Aircraft Lease Agreement in the same form as Schedule D, attached hereto and made a part hereof (collectively referred to as the "SPE Agreements"). The Members acknowledge that Tradewinds involvement in the SPE Agreements have been adequately disclosed and contain commercially reasonable terms and market rates.

## ARTICLE VI – LIMITATION OF LIABILITY; INDEMNIFICATION; INSURANCE

6.1     Limitation of Liability.  No Member, in such Member's capacity as a Member, shall be responsible or liable for any indebtedness or obligation of any other Member, incurred either before or after the execution and delivery of this Agreement by such Member, except as to those responsibilities, liabilities, indebtedness or obligations incurred pursuant to and as limited by the

terms of this Agreement, the Act or as otherwise expressly assumed. Except as otherwise provided by this Agreement, the Act or, expressly assumed, a person who is a Member or a Manager shall not be personally liable for the acts, debts or liabilities of the Company. Notwithstanding anything in this Agreement to the contrary, no Member or Manager shall be personally liable for either the return of the capital contributions of any other Member or the repayment of loans or advances (or any interest on them) to the Company by any Member, it being expressly understood that any such return or repayment shall be made solely from Company assets. No Member or Manager shall be liable to the Company or any Member for any loss resulting from any action or inaction by a Member or Manager, provided that such action or inaction was taken in good faith and does not constitute willful misconduct or gross negligence. Nothing contained in this Section 6.1 shall be construed as eliminating or limiting the liability of a Member or Manager for any of the following: (i) for any breach of the Manager's duty of loyalty to the Company or the Members, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) resulting from a violation of Section 308(1) of the Act, (iv) for any transaction from which the Manager derived an improper personal benefit or (v) for any act or omission occurring prior to the date of the approval of the Articles.

6.2    <u>Liability of Member to the Company</u>.    A Member who knowingly receives a distribution made by the Company which is either in violation of this Agreement or when the Company is insolvent is liable to the Company for the repayment of the distribution.

6.3    <u>Indemnification</u>.

6.3.1    <u>Indemnification</u>.    Except as otherwise provided in this Article VI, the Company shall indemnify any Member or Manager (collectively hereinafter referred to as "Indemnified Persons"), who was or is a party or is threatened to be made a party to a threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, and whether formal or informal (other than an action by or in the right of the Company) by reason of the fact that such person is or was a Member, Manager, employee or agent of the Company. The indemnification by the Company shall include the payment of any and all expenses (including attorneys' fees), judgments, penalties, fines and amounts paid in settlement actually and reasonably incurred by such Indemnified Person in connection with the action, suit or proceeding. Notwithstanding anything contained herein to the contrary, the Company shall have no obligation to indemnify an Indemnified Person unless the Indemnified Person acted in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner that the Indemnified Person reasonably believed to be in the best interests of the Company and, with respect to a criminal action or proceeding, if such person had no reasonable cause to believe such Indemnified Person's conduct was unlawful. To the extent that the Indemnified Person has been successful on the merits or otherwise in defense of an action, suit or proceeding referred to in this Section 6.3.1, or in defense of any claim, issue or other matter in the action, suit or proceeding, such person shall be indemnified against actual and reasonable expenses (including attorneys' fees) incurred by such Indemnified Person in connection with any action, suit or proceeding brought to enforce the mandatory indemnification provided for in this Section 6.3.1. Any indemnity under this Section 6.3.1 shall be provided out of and to the extent of Company assets only, and no Member shall have any personal liability an account thereof. The indemnity provided under this Section 6.3.1 shall survive the liquidation, dissolution and

termination of the Company and the termination of this Agreement and shall inure to the benefit of the successors, assigns, heirs, personal representative, administrators and legal representatives of such person.

6.3.2  Advance on Indemnification.  The Company shall pay or reimburse expenses incurred by an Indemnified Person who is a party or threatened to be made a party to an action, suit or proceeding in advance of final disposition if:

(i)  The Indemnified Person furnishes the Company with a written affirmation of the Indemnified Person's good faith belief that the Indemnified Person has met the applicable standard of conduct set forth in this Section 6.3;

(ii)  The Indemnified Person furnishes the Company a written undertaking to repay the advance if it is ultimately determined that the Indemnified Person did not meet the applicable standard of conduct set forth in this Section 6.3; and

(iii)  A good faith determination is made by the Manager that such actions would not preclude indemnification under this Agreement.

6.3.3  Authorization to Indemnify.  Any indemnification permitted under this Section 6.3 (unless ordered by a court) shall be made by the Company only as authorized in the specific case upon a good faith determination that the indemnification is proper under the circumstances because the person to be indemnified has met the applicable standard of conduct and upon an evaluation of the reasonableness of expenses and amounts paid in settlement. This determination and evaluation shall be made, in good faith, by the Manager. Notwithstanding any other provision of this Agreement to the contrary, no indemnification shall be provided to any Indemnified Person for or in connection with (i) actions taken in material violation of this Agreement, (ii) actions or omissions constituting fraud, willful misconduct or gross negligence in the management of the Company, (iii) the receipt of a financial benefit to which such person is not entitled, (iv) voting for or assenting to a distribution to Members in material violation of this Agreement or the Act or (v) a knowing material violation of the law. The termination of any action, suit or proceeding by settlement shall not, by itself, create a presumption that the Member did not act in good faith and in a manner that the Member reasonably believed to be in or not opposed to the Company's best interests. Any indemnification shall be made from Company assets only. The termination of any action, suit or proceeding by judgment, order, conviction or on a plea of nolo contendere or its equivalent shall create a presumption that the act or omission was done fraudulently, in bad faith or as a result of wanton or willful misconduct or, with respect to any criminal action or proceeding, that the Member had reasonable cause to believe that said Member's conduct was unlawful.

6.4  Liability Insurance.  The Company shall have the power to purchase and maintain insurance on behalf of any Indemnified Person, or any Indemnified Person who is or was serving at the request of the Company as a member, manager, partner, trustee, employee or agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise against any liability asserted against such Indemnified Person and incurred by such Indemnified Person in any such capacity or arising out of such Indemnified Person's status as such, whether or not the

Company would have the power to indemnify such Indemnified Person against such liability under the provisions of Section 6.3 or the Act.

## ARTICLE VII - TRANSFER OF INTERESTS

7.1     <u>Restrictions on Transfer</u>. Every sale, assignment, transfer, exchange, conveyance, pledge, disposition, grant, encumbrance, hypothecation, gift, testamentary disposition or any other complete or partial relinquishment of the legal or equitable ownership of a Member's Membership Interest, however characterized, whether voluntary or involuntary, by or without judicial proceedings or by operation of law, by a Member or an Assignee, defined herein ("Disposition"), shall be made only in accordance with this Article VII. The above restrictions shall specifically not apply to any Disposition of a Membership Interest to, a shareholder or member of a Member, a member of the family of a Member or such shareholder, or a trust for the benefit of such family member; provided, however, that the assignee of that transfer shall be subject to the same restrictions as set forth in this Article VII. Any attempted Disposition of a Membership Interest in violation of this Article VII shall be null and void and ineffective for all purposes, and any purported or attempted action contrary to this Article VII shall be a material breach of this Agreement. Neither the Company nor any Member of the Company shall be obligated to acknowledge such attempted Disposition or give any legal effect to the Disposition except that the attempted disposition shall suspend the voting rights of the transferring Member (the "Assignor") until the Assignor is readmitted as a Member in accordance with this Article. The transferee (the "Assignee") shall not have voting rights unless admitted as a Member by the Company.  No Disposition will be permitted unless prior written notice is provided to the Company.  Any Member who, voluntarily or involuntarily, transfers its entire Membership Interest or the entire financial portion of its Membership Interest shall no longer be a Member (and shall thereafter have no Member rights whatsoever).  Each Member hereby acknowledges the reasonableness of the restrictions contained in Section 7.1 herein in view of the purposes of the Company and the relationship of the Members.  In order for a Membership Interest to be transferred, the Assignor must:

> (i)     Obtain prior written consent of the Manager;

> (ii)     Obtain an opinion from legal counsel for the Company stating (a) that the Disposition will not cause a termination of the Company under the Act and/or the Code and (b) the Disposition will not violate any applicable state and federal securities laws and regulations;

> (iii)     Require that the Assignee of the Membership Interest provide the Company with all relevant information requested by the Manager and, if the Assignee is to be admitted as a Member, the Assignee must agree to become a party to and execute this Agreement and all other agreements as the Manager may require in connection with the transfer;

> (iv)     If the transfer is to a trust for the benefit of the transferring Member, the trustee grants to the Member an irrevocable proxy coupled with an interest to vote the transferred Membership Interest on any matter presented for vote or consent by the Company;

> (v)     If Member status has been requested, obtain the prior written consent of the Manager; and

21

(vi)   If Member status has been requested, pay or reimburse the Company for the legal and other costs of effecting admission as a Member and the Assignee shall provide written agreement to be liable for the obligations of the Assignor to make contributions and to return distributions.

If each and every condition and requirement set forth in this Section 7.1 is met, the Assignee shall be admitted as a substitute Member in the Company and, as they relate to the Membership Interest transferred, shall be entitled to all the rights and powers of the Assignor at the time of transfer and shall be subject to all of the restrictions and liabilities of the Assignor. Until all the terms and conditions set forth in this Section 7.1 are met, the Assignee shall not be a Member and shall instead remain an Assignee of the Membership Interest with the right only to receive allocations and distributions to which the former Member/Assignor would have been entitled. In any event, the Assignee's recourse is only against the Assignor, not the Company or the other Members. The Company shall have no fiduciary duty to the Assignee unless and until the Assignee is admitted as a Member.

7.2   Rights of Assignee.

7.2.1   Death or Dissolution of Member.  In the event of the death or dissolution of a Member, the receiver, other successor in interest, personal representative or heirs of the Members, as the case may be, to the extent of the deceased or dissolved Member's interest, will have such Member's rights in the capital, profits and losses and such Member's responsibilities regarding all of the obligations and liabilities as a Member, subject to and in accordance with the terms and conditions of this Agreement, and may be admitted to the Company as a Member in accordance with the terms and conditions of this Agreement, unless otherwise prohibited by its terms, upon the signing and delivery of transfer and assignment documents in form and substance satisfactory to the Manager.

7.2.2   Voluntary Transfer.  Except as specifically provided for in this Agreement, an Assignee who has not been admitted as a Member has no rights whatsoever under this Agreement. However, the provisions of this Agreement with respect to the interest acquired by the Assignee, including any remedies available to the Company or the other Members by reason of any default by the Assignor in performing the Assignor's obligations under this Agreement, will continue to be effective despite the assignment.  No assignment of any interest in the Company will be effective in any manner with respect to the Company until the Manager receives written notice of the assignment and complies with the requirements of Section 7.1.

7.2.3   Incompetency of Member. In the event of the incompetency of a Member, the personal representative of the Member, to the extent of the incompetent Member's interest, will have such Member's rights in the capital, profits and losses, and such Member's responsibilities regarding all of the obligations and liabilities as a Member, subject to and in accordance with the terms and conditions of this Agreement, and may be admitted to the Company as a Member in accordance with the terms and conditions of this Agreement, unless otherwise prohibited by its terms, upon the signing and delivery of transfer and assignment documents in form and substance satisfactory to the Manager.

7.2.4   <u>Transfer Resulting from Bankruptcy, Attachment or Judicial Order</u>.  In the event of the Disposition of a Membership Interest because of attachment, bankruptcy or judicial order, the assignee with respect to that interest, regardless of whether such interest had been a Member or Assignee interest, will have the status of an Assignee.  The transferee will not succeed to any right to participate in the management of the Company, to acquire any information regarding or accounting of any Company transaction, to inspect the Company books or records, to share in the use or occupancy of Company property or to vote on or consent to any of the matters on which a Member would otherwise be entitled to vote or consent.  The Assignee will be entitled only to receive the share of profits, losses and distributions to which the predecessor in interest would otherwise have been entitled.

7.3   <u>Section 754 Election</u>.  In the event of the Disposition of a Member's Membership Interest to an individual or entity that becomes a Member pursuant to any of the provisions hereof, the Company, if the substitute Member acquiring such Membership Interest so requests and the Manager consents, shall elect, pursuant to Code Section 754, to adjust the basis of the Company's property.  Each Member hereby agrees to provide the Company with all information necessary to give effect to such election.  The substitute Member shall reimburse the Company for any reasonable costs incurred as a result of such election, as determined by the Manager.

7.4   <u>No Right of Withdrawal</u>.  The Members shall not have any right of withdrawal or any right to receive any payment or distribution on any actual or purported withdrawal as provided for under the Act, including, but not limited to, Section 305 of the Act or any successor provision.  The Members (i) acknowledge that a withdrawal is a violation of this Agreement, (ii) agree not to withdraw and (iii) waive any right of withdrawal and any right to receive any payment, distribution or withdrawal provided for under the Act, including, but not limited to, Section 305 of the Act or any successor provision. Except as otherwise expressly provided herein, a withdrawing Member or the Assignee shall be entitled only to receive the share of profits, losses and distributions to which the withdrawing Member would otherwise have been entitled.

7.5   <u>Single Representative to Act on Behalf of Successors</u>.  In the event that a Member's Membership Interest is, at any time during the term of this Agreement (including any period of dissolution and winding up of the Company), held by more than one person, then all of the persons holding such Member's Membership Interest shall forthwith, but in any event within thirty (30) days after the date on which the Membership Interest of such Member is held by more than a single person, appoint one or more individuals as their collective authorized representative(s) who shall each have the power and authority, acting alone, to represent and bind and act on behalf of all of the Members so joined together and represented (i.e., all of the successors to the Membership Interest of such Member) in connection with all matters relating to this Agreement or the Company. An authorized representative designated as required in this Agreement shall act at the direction of that Member or those Members, represented by such authorized representative, who at the relevant time holds or collectively hold, as the case may be, a Percentage Interest which is in excess of fifty percent (50%) of the total Percentage Interest held by all the Members represented by such authorized representative.

7.6     Lifetime Transfers. In the event a Member desires to sell or transfer its Membership Interest in a manner as provided herein, such Member must first offer its Membership Interest for sale as follows:

7.6.1   Such Member shall first grant to Tradewinds, in writing, the option to purchase not less than all of the Membership Interest owned by the Member ("Lifetime Transfer Option") by delivery of notice to Tradewinds. Tradewinds shall within thirty (30) days after receipt of the Member's notice, notify such Member, and the remaining Members, in writing, of its intent to either exercise or not exercise such option. In the event that Tradewinds exercises the Lifetime Transfer Option, the purchase price shall be equal to the transferring Member's Percentage Interest multiplied by the net asset value of the Company, less all liabilities ("Option Purchase Price"). For purposes of calculating the net asset value of the Company (the "Calculation"), the Members agree that the value of the Company's capital common stock in Tradewinds shall be valued at an amount equal to twice the net book value of Tradewinds multiplied by the Company's ownership interest in Tradewinds. For the purpose of the Calculation, the net book value of Tradewinds shall mean the total shareholders equity in Tradewinds as set forth in the fiscal year-end financial statement prepared by the accountant then serving Tradewinds for the fiscal year-end immediately preceding the date of the option to purchase. Payment of the Option Purchase Price shall be payable pursuant to the terms set forth in Section 7.7 ("Payment Terms") and closed pursuant to the terms set forth in Section 7.8 ("Date of Closing").

7.6.2   In the event Tradewinds elects not to exercise its Lifetime Transfer Option, such Member shall then grant the Lifetime Transfer Option to the remaining Members, in writing, on a pro rata basis (based upon the remaining Members' Percentage Interest) . In the event any Member elects not to exercise its Lifetime Transfer Option, the remaining Members shall have the option to purchase such Membership Interest on a pro rata basis (excluding the percentage ownership of the Member who elects not to exercise its Lifetime Transfer Option). In the event that the remaining Members exercise the Lifetime Transfer Option, the purchase price shall equal the Option Purchase Price. Payment of the Option Purchase Price shall be payable pursuant to the Payment Terms on the Date of Closing.

7.6.3   In the event both Tradewinds and the remaining Members elect not to exercise their respective Lifetime Transfer Options, such Member shall then grant the Lifetime Transfer Option to the Company in writing. In the event that the Company exercises its Lifetime Transfer Option, the purchase price shall equal the Option Purchase Price. Payment of the Option Purchase Price shall be payable pursuant to the Payment Terms on the Date of Closing.

7.6.4   In the event Tradewinds, the remaining Members and the Company elect not to exercise their respective Lifetime Transfer Options, such Member desiring to transfer its Membership Interest may sell its Membership Interest to any third party purchaser ("Bona Fide Purchaser") at a price and upon such payment terms to be negotiated between the Member and the Bona Fide Purchaser.

7.7     Payment Terms.  The Option Purchase Price shall be paid on the Date of Closing in the following manner:

7.7.1  Down Payment.  A down payment ("Down Payment") in an amount equal to twenty percent (20%) of the Option Purchase Price shall be payable on the Date of Closing.

7.7.2  Promissory Note.  The balance of the Option Purchase Price shall be paid by the execution and delivery of the Company's or the remaining Member's, as the case may be, non-negotiable Promissory Note ("Promissory Note") in the same form as Schedule E, attached hereto and made a part hereof.  The Promissory Note shall be delivered to the selling Member on the Date of Closing.  The Promissory Note shall be payable in sixty (60) equally monthly installments of principal and interest.

7.8    Date of Closing.  The Date of Closing shall take place at the registered office of the Company (or such other location designated by the Company) not sooner than thirty (30) days nor later than one-hundred twenty (120) days from the date of the exercise of a Lifetime Transfer Option.  The specific Date of Closing shall be set by the party exercising the Lifetime Transfer Option.

## ARTICLE VIII - DISSOLUTION

8.1    Events Causing Dissolution.  The Company shall be dissolved and its affairs wound up upon the happening of any of the following events:

(i)    Upon the expiration of the period fixed for the Company's duration as provided in Section 1.4; or

(ii)    Upon the issuance of an order of dissolution by a court of appropriate jurisdiction in the county in which the principal office of the Company is located or by the Secretary of State; or

(iii)    Upon the decision of the Manager to dissolve the Company.

8.2    Cessation of Business.  As soon as possible following the occurrence of any of the events specified in Section 8.1, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business.  Its separate existence shall continue until a Certificate of Dissolution has been accepted for filing by the Michigan Department of Labor and Economic Growth, Bureau of Commercial Services, or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

8.3    Winding Up, Liquidation and Distribution of Assets.  Upon dissolution, the following steps shall be taken, in the following order:

8.3.1    Liquidating Manager.  The Manager shall appoint a liquidating manager ("Liquidating Manager");

8.3.2    Accounting.  An accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations from the date of the last previous accounting until the date of dissolution;

8.3.3   Assets Sold.   All of the Company's assets shall be sold or otherwise liquidated as promptly as practicable (except to the extent any assets are to be distributed to the Members in kind);

8.3.4   Allocation.   Any net profits or net losses resulting from such sales and liquidations shall be allocated to the Member's capital accounts in accordance with each Member's respective Percentage Interest, except as may be required by Section 704 of the Code, the Treasury Regulations thereunder or any of the other provisions of Article III;

8.3.5   Liabilities.   All liabilities of the Company shall be paid, including liabilities to Members who are also creditors, to the extent otherwise permitted by law, except for liabilities to Members for distributions and the return of capital;

8.3.6   Reserves.   Reserves shall be established as may be reasonably necessary to provide for contingent liabilities of the Company, and the amounts of such reserves shall be deemed to be an expense of the Company for the purpose of determining the capital accounts of the Members; and

8.3.7   Distribution.   All remaining assets will be distributed in the following order:

(i)   Distribute the remaining assets to the Members in accordance with their positive capital account balances;

(ii)   If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the capital accounts of the Members shall be adjusted pursuant to the Percentage Interest to reflect such deemed sale, except as may be required by Section 704 of the Code, the Treasury Regulations thereunder or any of the provisions of Article III.

(iii)   The positive balance (if any) of each Member's capital account (as determined after taking into account all capital account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Liquidating Manager, with any assets distributed in kind being valued for this purpose at their fair market value. Any such distributions to the Members in respect of their capital accounts shall be made in accordance with the requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations. Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit capital account (after giving effect to all contributions, distributions, allocations and other capital account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any capital contribution, and the negative balance of such Member's capital account shall not be considered a debt owed by such Member to the Company or to any other person for any purpose whatsoever.

8.4     Certificate of Dissolution.  Upon the occurrence of any of the events specified in Section 8.1 and after all debts, liabilities and obligations have been paid and discharged or adequate provision has been made therefore and all of the remaining property and assets have been distributed to the Members, a Certificate of Dissolution shall be filed with the Michigan Department of Consumer and Industry Services, Bureau of Commercial Services.

8.5     Post Dissolution Actions.   Upon acceptance for filing of the Certificate of Dissolution, the existence of the Company shall cease and terminate, except for the purpose of suits, other proceedings and appropriate actions as provided in the Act.  Any amounts deemed necessary by the Liquidating Manager to provide a reserve for any unforeseen liabilities and obligations may, in the Manager's discretion, be deposited in a bank or trust company upon such terms and for a said period of time as the Manager may determine.  The Liquidating Manager shall have authority to distribute any Company property discovered after dissolution, distribute any reserve balances after contingent liabilities have been determined and paid, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.  The remaining assets of the Company shall be distributed to the Member's in accordance with their positive capital account balance.

8.6     Return of Contribution Nonrecourse to Other Members.  Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of their respective contributions.

## ARTICLE IX - ARBITRATION

9.1     Arbitration.   Any and all disputes, claims or controversies involving the interpretation of this Agreement or any of the provisions, terms, conditions, termination or enforcement of a Member's obligations or rights hereunder ("Disputes") shall be submitted in writing ("Notice") by a Member to the Manager within thirty (30) days of the occurrence of any Dispute.  A meeting shall be held within forty-five (45) days from the submission of the written Notice between the Member and the Manager or any designated agent of the Manager at a neutral location for the purpose of attempting in good faith to negotiate a resolution of the Dispute.  If the Dispute is not resolved within forty-five (45) days of the meeting between the Manager and the Member, the Dispute shall be submitted to binding arbitration and exclusively resolved in accordance with the then prevailing Commercial Arbitration Rules ("Rules") of the American Arbitration Association ("AAA"); provided, however, that notwithstanding anything to the contrary contained in the Rules, the arbitrator shall apply the laws governing this Agreement as set forth in Section 9.3 herein and shall not act as an amiables compositeur.  The arbitration is to be conducted by a single arbitrator in Southfield, Michigan, in accordance with the Rules of the AAA existing as of the time the arbitration is commenced.  Modification to the procedures set forth herein may be made only for exceptional good cause as determined by the arbitrator.  In the event either party shall fail, after reasonable advance notice, to appear and participate in the arbitration proceeding, the arbitrator shall be entitled to make a decision and make an award on the basis of evidence, witnesses and arguments presented by the parties so appearing before the arbitrator.  Pending decision by the arbitrator with respect to the Dispute, all other obligations of the parties hereto shall continue as contemplated by this Agreement.  The Parties shall be entitled to discovery as provided in the Michigan Court Rules of 1985, as amended.  The arbitrator shall have no authority to award punitive damages or other damages not measured by the prevailing party's actual damages, and

may not, in any event, make any ruling, finding or award that does not conform to the provisions of this Agreement. Any arbitration proceeding under this Agreement must be commenced no later than one (1) year after the Dispute arose. Failure to timely commence an arbitration proceeding constitutes both an absolute bar to the commencement of any arbitration proceedings with respect to the Dispute, and a waiver of the Dispute.

9.2     Award; Enforcement. In making an award, the arbitrator shall be governed by the provisions of this Agreement and the common law and statutes of the State of Michigan. The arbitrator shall have no authority to change any provision of this Agreement. The award shall allocate the fees and expenses of such arbitration equally between or among the parties to the arbitration but each party shall pay for the cost of its counsel, witnesses and other related expenses. The determination of the arbitrator shall be final and binding upon the parties, shall not be appealable and judgment on the award or determination rendered pursuant to this Agreement may be entered in any court pursuant to Section 9.3. The decision of the arbitrator (or the failure of a party to submit the Dispute to arbitration or to appear and participate in the arbitration in accordance with the terms of Section 9.1 herein) shall be a complete defense to any suit, action or proceeding initiated in any federal, state or local court or before any administrative agency with respect to any Dispute which is arbitrable as set forth herein. This Agreement is specifically made subject to and incorporates the provisions of Michigan law governing arbitrations, MCLA 600.5001; MSA 27A.5001, as amended, and the applicable court rules, MCR 3.602, as amended. This agreement to arbitrate shall be specifically enforceable against each of the parties and no party has the right to revert to any federal, state or local court or administrative agency concerning alleged breaches of this Agreement except as otherwise provide in Sections 9.2 or 9.4 herein. Arbitration shall be the exclusive remedy for any Dispute under this Agreement except to the extent the specific enforcement of the award or specific enforcement of any term or provision of this Agreement in a court having equitable jurisdiction by a decree of specific performance or an injunction or by both is deemed necessary and appropriate by a party (including, but not limited to, any matter covered by Section 9.4), and (ii) except with respect to the non-payment of monies due and owing in accordance with the terms of this Agreement.

9.3     Governing Law; Jurisdiction. This Agreement shall be construed and enforced in accordance with and governed by the internal laws of the State of Michigan without regard to the choice or conflict-of-law principles. The parties irrevocably agree and consent that venue is proper in the Circuit Court for the County of Oakland, State of Michigan, and shall be the sole and proper forum for any litigation arising out of or in connection with this Agreement pursuant to Section 9.2 and Section 9.4 herein. The parties agree not to commence, maintain or remove any action or proceeding arising out of or relating to this Agreement or any other documents or agreements executed in connection with the closing of the transactions contemplated by the terms of this Agreement in any other state or federal court and each party waives any substantive, procedural, jurisdictional, convenient forum, venue or other rights to the contrary. Any and all service of process and any other notice in any such action, suit or proceeding shall be effective against any party anywhere in the world if given pursuant to the applicable court rules of the appropriate court having jurisdiction hereunder.

9.4     Specific Performance; Injunctive Relief. The parties hereby acknowledge and agree that the Membership Interests are not freely purchased or sold in the open market and that the

28

covenants made herein are of value to the parties only if fully performed by them, and that the parties (i) will incur substantial and irreparable damage, (ii) that the damages suffered by the parties may be difficult to ascertain, and (iii) that money damages may not be an adequate remedy for any actual or threatened breach of the provisions of this Agreement. Therefore, the parties hereby agree that each and every one of the terms of this Agreement and any arbitration determination shall be enforceable in the Circuit Court for the County of Oakland (without posting any bond or deposit) for the purpose of obtaining an order compelling specific performance or injunctive relief (without posting a bond or other security) without the necessity of proving it has suffered any actual damage.

## ARTICLE X - MISCELLANEOUS

10.1    Security Law Restrictions. Each Member acknowledges that any ownership security or other interest in the Company has not been registered under the Securities Act of 1933, as amended, nor has the Company been registered under any other federal laws, the laws of the State of Michigan or any other state (for purposes of this Section collectively the "Securities Acts"), because the Company is issuing the Membership Interests in reliance upon: (i) exemptions from the registration requirements of the Securities Acts providing for issuance of securities not involving a public offering, (ii) the fact that the Membership Interests are to be held by each Member for investment and (iii) the fact that exemption from registrations under the Securities Acts would not be available if the Membership Interests were acquired by a Member with a view to distribution. Accordingly, each Member hereby affirms to the Company that such Member is acquiring the Membership Interest for such own Member's account, for investment and not with a view to the resale or distribution thereof. Each Member agrees not to transfer any portion of such Member's Membership Interest unless there is an effective registration or exemption from registration relating thereto under the Securities Act of 1933 and under any applicable Securities Acts or unless the Member delivers to the Company an opinion of counsel satisfactory to the Company that such registration or other qualification under the Securities Acts is not required in connection with such Disposition. Each Member understands that the Company is under no obligation to register the Membership Interests or to assist any Member in complying with any exemption from registration under the Securities Acts if such Member should at a later date wish to transfer its Membership Interest. Furthermore, each Member realizes that the Membership Interests are unlikely to qualify for disposition under Rule 144 of the Securities and Exchange Commission unless such Member is not an affiliate of the Company and the Membership Interest has been beneficially owned and fully paid for by such Member for at least three (3) years. Prior to acquiring a Membership Interest, each acquiring Member has made an investigation of the Company and its business and the Company has made available to each such Member all information with respect thereto that such Member needed to make an informed decision to acquire the Membership Interest. Each Member has relied on its own tax and legal advisors in connection with such Member's decision to acquire a Membership Interest. Each Member considers itself to be a person possessing experience and sophistication as an investor which are adequate for the evaluation of the merits and risks of such Member's investment in the Membership Interest. Each Member has no need for liquidity in its investment in the Membership Interest. Each Member, therefore, is prepared to bear the economic risk of this investment for an indefinite period of time because the Membership Interest being purchased hereunder have not been registered under the Securities Acts and, therefore, cannot be sold unless they are subsequently registered under the Securities Acts or an exemption from such registration is available.

29

10.2   <u>Tax and Fiscal Years</u>. The operating fiscal year of the Company shall be the calendar year end. The tax year of the Company shall be the calendar year end.

10.3   <u>Books of Account and Records</u>. Complete and accurate records and books of account of the Company's operations showing the assets, liabilities, costs, expenditures, receipts, profits and losses of the Company shall be maintained by the Manager, and all transactions and other matters relating to the Company's business shall be entered into said records and books of accounts in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. Such books of account and records shall include provisions for separate capital accounts for the Members and shall provide for such other matters and information as a Member shall reasonably request, together with copies of all documents, executed on behalf of the Company. Such books and records shall be maintained by the Manager at the registered office of the Company, together with all other records required to be maintained by the Act. Each Member and its representatives, duly authorized in writing, shall have the right to inspect and examine, at all reasonable times, at the registered office of the Company, all such books of account, records and documents. All decisions as to accounting matters, except as specifically provided to the contrary herein, shall be made by the Manager in accordance with generally accepted accounting principles consistently applied. Such decisions shall be acceptable to the accountants retained by the Company, and the Manager may rely upon the advice of the accountants as to whether such decisions are in accordance with generally accepted accounting principles. The accountants for the Company shall be approved by the Manager.

10.4   <u>Tax Returns and Financial Reports</u>. Income tax returns for the Company shall be prepared and filed with the appropriate authorities when required by law. The Company shall provide estimated taxable income information and member tax information returns (including, but not limited to, Schedule K-1) to each Member as soon as practicable in order to provide the Members with adequate time to file their respective income tax returns. Within one hundred twenty (120) days after the end of the fiscal year, each Member shall be sent a report of the business and operations of the Company during such year. Such report shall contain a copy of the annual financial statement of the Company that shall include a balance sheet, statement of cash flow and income statement.

10.5   <u>Bank Accounts and Investment of Funds</u>. All funds of the Company shall be deposited in its name in such checking accounts, savings accounts, time deposits or certificates of deposit or shall be invested in such other manner, as shall be determined by the Manager from time to time. Any check of the Company may be signed by the Manager.

10.6   <u>Consent of Member</u>. Various provisions of this Agreement require or permit the consent, agreement, approval or disapproval, written or otherwise, of the Members. In any such case, the Manager may give each Member written notice of the action, event or agreement, and if such notice expressly so states, then if a Member does not indicate his disapproval by written notice to the Manager within the period of time (not less than fifteen [15] days after mailing of the notice) specified in the notice, it shall be deemed to have given its written consent, approval or agreement.

10.7   <u>Covenant to Sign Documents</u>. Each Member covenants on behalf of such Member and such Member's successors and assigns to execute, with acknowledgment, verification or affidavit if required, any document or writing that may be necessary or expedient in the creation of

this Company, any amended Articles and any other writing which may be required by any rule of law or which may be appropriate to the effecting of any action by or on behalf of the Company or the Members which has been taken in accordance with the provisions of this Agreement.

10.8   Notices.

10.8.1 Requirement of a Writing; Permitted Methods of Delivery. Each party giving or making any notice, request, demand or other communication (each, a "Notice") pursuant to this Agreement shall give the Notice in writing; cause the Notice to be signed; and use one of the following methods of delivery, each of which for purposes of this Agreement is a writing: personal delivery; Registered or Certified Mail, in each case, return receipt requested and postage prepaid; nationally recognized overnight courier, with all fees prepaid; and facsimile.

10.8.2 Addressees and Addresses. Each party giving a Notice shall address the Notice to the appropriate person at the receiving party (the "Addressee") at the address listed below or to another Addressee or at another address as designated by a party in a Notice delivered pursuant to this Section.

If to Members, to:

Tradewinds Aviation, Inc.
Oakland County International Airport
6320 Highland Road
Waterford, Michigan 48327
Attention: Richard M. Nini

Robert Skandalaris
2169 Tottenham Road
Bloomfield Hills, Michigan 48301

Holdon f/b/o/ David L. Hayes Custodial IRA
519 Madison Avenue, 3rd Floor
Toledo, Ohio 43604
Attention: Chris Kozyra, Trust Administrator

Al Air, LLC
c/o G-7550 S. Saginaw Street, Suite #5
Grand Blanc, Michigan 48439
Attention: Albert F.Kessel

Air Banks LLC
516 Lakeview Road
Villa III
Clearwater, Florida 33756
Attention: Robert J. Banks

31

Don DeFosset
3203 Bayshore Blvd., #19P
Tampa, Florida 33629

Windsong LLC
300 East Long Lake Road, Suite 311
Bloomfield Hills, Michigan 48304
Attention: Walter Knysz, Jr.

MJK Family LLC
2270 Holbrook Street
Hamtramck, Michigan 48212
Attention: Michael J. Kowalski

Mark II Aviation, LLC
260 E. Brown Street, Suite 310
Birmingham, Michigan 48009
Attention: Mark W. Davis

S4Air LLC
21810 Clessie Court
New Hudson, Michigan 48165
Attention: Greg Boll

Convenienso, LLC
211 N. Clinton, Suite 2N
Chicago, Illinois 60661
Attention: Casey Cowell

If to the Company, to:          Corporate Eagle Jet, LLC
                                Oakland County International Airport
                                6320 Highland Road
                                Waterford, Michigan 48327
                                Attention: Richard M. Nini

Any party by notice hereunder may designate other addresses to which Notices will be sent.

10.8.3 Effectiveness of a Notice.   Except as provided elsewhere in this Agreement, a Notice is effective only if the party giving the Notice has complied with subsections 10.8.1 and 10.8.2 and if the Addressee has received the Notice. A Notice is deemed to have been received as follows: (i) if a Notice is delivered in person, or sent by Registered or Certified Mail or nationally recognized overnight courier, upon receipt as indicated by the date on the signed receipt; (ii) upon receipt by the party giving the Notice of an acknowledgement or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the Addressee's facsimile number; (iii) if the Addressee

rejects or otherwise refuses to accept the Notice, or if the Notice cannot be delivered because of a change in address for which no Notice was given, then upon the rejection, refusal or inability to deliver the Notice; and (iv) despite the other clauses of this subsection 10.8.3, if any Notice is received after 5:00 p.m. (a) on a business day where the Addressee is located, or (b) on a day that is not a business day where the Addressee is located, then the Notice is deemed received at 9:00 a.m. on the next business day where the Addressee is located.

10.9 Headings. The headings contained in this Agreement are inserted for convenience only and will not be deemed to constitute a part of this Agreement. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number, as the circumstances require. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. The parties intend that each representation, warranty and covenant contained herein shall have independent significance. All exhibits and schedules, if any, referred to herein are hereby incorporated herein by reference and made a part hereof.

10.10 Complete Agreement; Severability. This Agreement and its exhibits, represent the entire and final agreement and understanding among the parties with respect to the transactions contemplated by this Agreement and supersede all prior and contemporaneous negotiations, agreements, understandings, arrangements, drafts, covenants, representations, and warranties, whether written or oral, of any party dealing with such subject matter between the parties with respect to the subject matter contained in this Agreement, are expressly merged into and superseded by this Agreement and constitute (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. No representation, warranty, promise, inducement or statement of intention has been made by either party which is not set forth in this Agreement or the documents referred to in this Agreement, and neither party shall be bound by, or be liable for, any alleged representation, promise, inducement or statement of intention not set forth herein or therein. The provisions of this Agreement may not be explained, supplemented or qualified through evidence of trade usage or a prior course of dealings. There are no conditions precedent to the effectiveness of this Agreement, other than those expressly stated in this Agreement. If any provision of this Agreement, or any portion thereof, is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision, or portion, thereof, shall be deemed reformed or deleted, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Agreement shall remain in full force and effect.

10.11 Default; Waiver. A default by one party does not justify recession or default by another unless all other nondefaulting parties agree. Subject to the remainder of this Section 10.11, at any time, any party may (i) extend the time for the performance of any of the obligations or other

acts of the other party, (ii) waive any inaccuracy in the representations and warranties of the other party in this Agreement, and (iii) waive compliance by any other party with any of the agreements or conditions in this Agreement. Any extension or waiver will be valid only if set forth in a written instrument signed by the party sought to be bound. No waiver of any such inaccuracy will constitute or be construed as a waiver of any other inaccuracy, and no waiver of a failure to comply with any provision of this Agreement will constitute or be construed as a continuing waiver of that provision or as a waiver of any other failure to comply with any provision of this Agreement.

10.12 No Third Party Beneficiaries. This Agreement is for the sole and exclusive benefit of the parties hereto, and their successors and permitted assigns, and no provision of this Agreement shall be deemed to confer upon any third party, any remedy, claim, liability, reimbursement, cause of action or other right. Nothing expressed or referred to in this Agreement will be construed to give any person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. There are no other third party beneficiaries to this Agreement. No third person or creditor shall under any circumstances have any right to compel any actions by or payments from the Company or the Members by virtue of this Agreement. The discretion granted to the Manager and the Members in this Agreement are personal to them, and no receiver, trustee or liquidator of the Company's business shall have the right or power to exercise any such discretions.

10.13 Binding Effect of Agreement. Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns. Whenever, in this Agreement, a reference to any Member is made, such reference shall be deemed to include a reference to the permitted successors and assigns of such Member.

10.14 Counterparts. This Agreement may be executed in any number of separate counterparts (including facsimile), each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement, notwithstanding that all parties are not signatory to the original or the same counterpart, provided that no provision of this Agreement shall become effective and binding unless and until all parties have duly executed and delivered a counterpart of this Agreement, at which time this Agreement shall then become effective and binding as of the date first above written. The Manager shall have the right and authority to cause the separate counterparts to be assembled into a single executed Agreement, with multiple signature pages. Any signed counterpart of this Agreement that is delivered by facsimile transmission shall be deemed to be executed and delivered, for all purposes hereof.

10.15 Amendments. No alterations, amendments, changes or additions to the terms of this Agreement shall be binding upon the parties hereto unless and until reduced to writing and signed by all of the parties.

10.16 Distributions. No distributions shall be made contrary to Section 307 of the Act.

10.17 Power of Attorney. Each Member hereby irrevocably makes, constitutes and appoints the Manager, with full power of substitution, so long as such Manager is acting in such

capacity (and any successor Manager thereof so long as such Manager is acting in such capacity), its true and lawful attorney, in such Member's name, place and stead (its is expressly understood and intended that the grant of such power of attorney is coupled with an interest) to make, execute, sign, acknowledge, swear and file with respect to the Company: (i) all amendments of this Agreement adopted in accordance with the terms hereof; (ii) all documents which the Manager deems necessary or desirable to effect the dissolution and termination of the Company; (iii) all such other instruments, documents and certificates which may from time to time be required by the laws of the State of Michigan or any other jurisdiction in which the Company shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement, continue and defend the valid existence of the Company; and (iv) all instruments, documents and certificates which the Manager deems necessary or desirable in connection with any reorganization which has been authorized in accordance with the terms of this Agreement. This power of attorney shall not be affected by and shall survive the bankruptcy, insolvency, death, incompetency, or dissolution of a Member and shall survive the delivery of any assignment by the Member of the whole or any portion of its Membership Interest. Each Member hereby releases each Manager from any liability or claim in connection with the exercise of the authority granted pursuant to this power of attorney.

10.18 Estoppel Certificate. Each Member shall, within ten (10) days after written request by the Manager, deliver to the Manager a certificate stating, to the Member's knowledge, that: (i) this Agreement is in full force and effect; (ii) this Agreement has not been modified except by any document or documents identified in the certificate; and (iii) there is no default under this Agreement by the Manager or any other Member, or if there is a default, the nature and extent of it. If the certificate is not received within that ten (10) day period, the Manager will execute and deliver the certificate without qualification on behalf of the requested Member, pursuant to the power of attorney granted in Section 10.17 herein except that if the Manager signing the certificate has actual personal knowledge of any qualification, the qualification will be included in the certificate.

10.19 Conflicts of Interest. The parties having acknowledged that legal counsel preparing this Agreement was representing the Company ("Counsel"), and that: (i) Kotz, Sangster, Wysocki and Berg, P.C., as Counsel, prepared this Agreement at the Company's request, (ii) the Members have been advised by Counsel that a conflict exists among their individual interests, (iii) each Member has been advised by Counsel to seek the advice of independent counsel, (iv) each Member has had the opportunity to seek the advice of independent counsel, (v) the parties have received no representations from Counsel about the tax consequences of this Agreement, (vi) the parties have been advised by Counsel that this Agreement may have tax consequences, (vii) the parties have been advised by Counsel to seek the advice of independent tax counsel, (viii) the parties have had the opportunity to seek the advice of independent tax counsel and (ix) each party has had all information necessary to make an informed decision regarding this Agreement and that any claims against Counsel regarding any possible conflict of interest regarding this Agreement or its preparation are waived.

10.20 Assignment. No party to this Agreement may assign its rights or obligations under this Agreement without the prior written consent of all of the other parties. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the

35

benefit of the successors and permitted assigns of the Company and each Member and its executor, personal representative and proper transferees.

10.21 <u>Time for Performance</u>. Time is of the essence as to the performance of each and every one of the obligations of the parties under this Agreement.

10.22 <u>Rights and Remedies; Remedies Not Exclusive</u>. No failure or delay on the part of any party in the exercise of any right or remedy under this Agreement will impair that right or remedy or be construed to be a waiver of, or acquiescence in, any inaccuracy or breach of any representation, warranty or agreement in this Agreement, nor will any single or partial exercise of any right or remedy preclude other or further exercise of that right or remedy, or of any other right or remedy. Except where it is expressly stated to be the exclusive remedy, no remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise.

10.23 <u>Survival</u>. Except as otherwise provided in this Agreement, the provisions of this Agreement will survive the execution, delivery and performance of this Agreement.

10.24 <u>Indemnification</u>. Each and every party who defaults under the terms of this Agreement hereby agrees to indemnify and hold harmless the nondefaulting parties from any claims, demands, losses, damages, actions, causes of action, judgments, expenses, costs, including attorney and accounting fees, obligations or liabilities which said nondefaulting parties may sustain or incur as a result of or arising out of the actions or failure to act by a party who is in default under the terms of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first written above.

"COMPANY"

**CORPORATE EAGLE JET, LLC**, a Michigan limited liability company

By: **Tradewinds Aviation, Inc.**, a Michigan corporation

Its: Manager

By: _____
Richard M. Nini, President

Dated: *12-4-06*

36

**"MEMBERS"**

**Tradewinds Aviation, Inc.,** a Michigan corporation

By

Richard M. Nini, President

Dated: _12-4-06_

**Robert Skandalaris**

Robert Skandalaris

Dated: _12.5.06_

**Holdon f/b/o David L. Hayes**
**Custodial IRA**

By: _Scott Holden_

Its _Vice President, Trust Operations_

Dated: _12-8-06_

**Al Air, LLC, a Michigan limited**
**liability company**

By

Albert F. Kessel, Manager

Dated: _12-13-06_

**Air Banks LLC**

By:

Robert J. Banks, Managing Member

Dated: _12·22·06_

37

**Don DeFosset**

Don DeFosset

Dated: _12/19/06_

**Windsong LLC**

By: _____
    Walter Knysz, Jr., Manager

Dated: _12-23-06_

**MJK Family LLC**

By: _____
    Michael J. Kowalski, Manager

Dated: _12/14/06_

Mark II Aviation, LLC

By: _____
    Mark W. Davis, Manager

Dated: _1/26/07_

S4Air LLC

By: _____
    Greg Bol?, President

Dated: _6/18/07_

Convenienso, LLC

By: _____

Casey Cowell

Owner / Principal / President

Dated: _____

**SCHEDULE A**
**CORPORATE EAGLE JET, LLC**
**OPERATING AGREEMENT**

| NAMES AND ADDRESSES | CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|
| Tradewinds Aviation, Inc.<br>Oakland County International Airport<br>6320 Highland Road<br>Waterford, Michigan 48327<br>Attention: Richard M. Nini | 0.00 | 4% |
| Robert Skandalaris<br>2169 Tottenham Road<br>Bloomfield Hills, Michigan 48301 | $500,000.00 | 9.6% |
| Holdon f/b/o David L. Hayes<br>Custodial IRA<br>519 Madison Avenue, 3rd Floor<br>Toledo, Ohio 43604<br>Attention: Chris Kozyra<br>       Trust Administrator | $500,000.00 | 9.6% |
| Al Air, LLC<br>c/o G-7550 S. Saginaw St., Suite #5<br>Grand Blanc, Michigan 48439<br>Attention: Albert F. Kessel | $500,000.00 | 9.6% |
| Air Banks LLC<br>516 Lakeview Road<br>Villa III<br>Clearwater, Florida 33756<br>Attention: Robert J. Banks | $500,000.00 | 9.6% |
| Don DeFosset<br>3203 Bayshore Blvd, # 19P<br>Tampa, Florida 33629 | $500,000.00 | 9.6% |
| Windsong LLC<br>300 East Long Lake Road, Suite 311<br>Bloomfield Hills, Michigan 48304<br>Attention: Walter Knysz, Jr. | $500,000.00 | 9.6% |

| NAMES AND ADDRESSES | CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|
| MJK Family LLC<br>2270 Holbrook Street<br>Hamtramck, Michigan 48212<br>Attention: Michael J. Kowalski | $500,000.00 | 9.6% |
| Mark II Aviation, LLC<br>260 E. Brown Street, Suite 310<br>Birmingham, Michigan 48009<br><br>Attention: Mark W. Davis | $500,000.00 | 9.6% |
| S4Air LLC<br>21810 Clessie Court<br>New Hudson, Michigan 48165<br>Attention: Greg Boll | $500,000.00 | 9.6% |
| Convenienso, LLC<br>211 N. Clinton, Suite 2N<br>Chicago, Illinois 60661<br>Attention: Casey Cowell | $500,000.00 | 9.6% |
| TOTAL | $5,000,000.00 | 100% |

"COMPANY"

**CORPORATE EAGLE JET, LLC**, a
Michigan limited liability company

By: **Tradewinds Aviation, Inc.**, a
Michigan corporation

Its: Manager

By: _____

Richard M. Nini, President

Dated: _12-4-06_____

"MEMBERS"

**Tradewinds Aviation, Inc.**, a Michigan corporation

By: _____
Richard M. Nini, President

Dated: 12-4-06

**Robert Skandalaris**

_____
Robert Skandalaris

Dated: 12.5.06

**Holdon f/b/o David L. Hayes Custodial IRA**

By: _____

Its: _____

Dated: 12-8-06

**Al Air, LLC**

By: _____
Albert F. Kessel, Manager

Dated: 12-12-06

**Air Banks LLC**

By: _____
Robert J. Banks, Managing Member

Dated: 12 - 22 - 06

**Don DeFosset**

Don DeFosset

Dated: _12-19-06_

**Windsong LLC**

By: _____
    Walter Knysz, Jr., Manager

Dated: _12-23-06_

**MJK Family LLC**

By: _____
    Michael J. Kowalski, Manager

Dated: _12/14/06_

Mark II Aviation, LLC

By: _____
    Mark W. Davis, Manager

Dated: _1/26/07_

S⁴Air LLC

By: _____
    Greg Boll, President

Dated: _6/8/07_

Convienenso, LLC

By: _____
    Casey Cowell
    Owner / Principal / President

Dated: _7/17/07_