UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE MJK FAMILY LLC,
AIR BANKS, LLC, WINDSONG LLC,
MARK II AVIATION, LLC,
CONVENIENSO, LLC, S4AIR LLC,
NATIONAL CITY BANK
as Trustee for THE DAVID L. HAYES IRA,
ROBERT SKANDALARIS, and
DON DEFOSSET,

        Plaintiffs,

                                    Civil No. 09-12613
                                    Hon. John Feikens

        v.

CORPORATE EAGLE MANAGEMENT
SERVICES, INC., and
RICHARD M. NINI,

        Defendants.
_____/

**OPINION AND ORDER DENYING**
**DEFENDANTS' MOTION TO DISMISS**

        In their Complaint, Plaintiffs allege that Defendants Corporate Eagle Management Services,

Inc. ("CEMS") and Richard M. Nini, as president and CEO of CEMS and as an individual ("Nini"),

violated § 10(b) of the Securities Exchange Act and Securities and Exchange Commission ("SEC")

Rule 10b-5 by making fraudulent misrepresentations and omissions regarding Defendants' conflicts

of interest relevant to their sale of securities in Corporate Eagle Jet to Plaintiffs.  The issue before

the Court is whether Plaintiffs adequately alleged that Defendants made false or misleading

statements that they had a duty to disclose.

# I.  BACKGROUND

## A.  The Facts Set Forth in the Complaint[1]

1.    *CEMS Creates and Capitalizes Corporate Eagle Jet*

CEMS was originally founded by Nini in 1985.  Compl. ¶ 14.  Nini exerts substantial control over CEMS as its President, Chief Executive Officer, majority shareholder, and member of its board of directors.  Compl. ¶ 15.  CEMS manages and maintains privately-owned aircraft.  Among its services, CEMS sells and leases fractional interests in aircraft, in return for which it receives a commission.  Compl. ¶ 17.  The "fractional interests" program allows purchasing (or leasing) "members" to time-share the aircraft with other members.

In 2006, Nini planned to expand CEMS by opening a second base of operations in Florida, which would include a private terminal with adjacent hangars, administrative facilities, and one to five aircraft.  Compl. ¶¶ 20-21.  To effectuate this plan, Nini, through CEMS, sought $5,000,000 in capital investments to form a new entity, Corporate Eagle Jet, LLC ("CEJ").  Compl. ¶¶ 23-24.

Once capitalized, CEJ was to immediately purchase a thirty-percent equity position in CEMS (for $1.2 million), and receive three seats on CEMS's board of directors.  Compl. ¶¶ 22-23.  CEJ would then purchase a previously-owned aircraft and sell/lease fractional interests in it.  After all shares for the aircraft were sold/leased, CEJ would repeat the process with an additional aircraft.  Compl. ¶ 29.  CEMS, under Nini's control, would manage CEJ, and execute all transactions necessary to implement the business plan.  Compl. ¶ 30.  In exchange, CEMS would receive two percent of the value of any sale or lease of a fractional interest in aircraft, and a two percent fee if

---

[1]The following facts are taken from the Complaint, and are not findings of fact by the Court.  The Court, as it must, assumes these facts to be true for the purpose of deciding Defendants' Motion, and construes them in the light most favorable to Plaintiff.  *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).

any trade-in aircraft was resold.  Compl. ¶ 32.

To solicit investors for CEJ, Nini and CEMS prepared an "Investment Presentation", including an Executive Summary and various Offering Materials.[2]  Compl. ¶¶ 27-28.  The Offering Materials emphasized that CEJ's operations would focus on the Florida market.  Compl. ¶¶ 28, 41.

The Offering Materials also included several statements addressing conflicts of interest:

1)  Section 5.4 of the Operating Agreement, entitled "Transactions with Affiliates," generally permitted CEMS to enter into transactions with its affiliates if the transactions were disclosed to the CEJ's members and contained "commercially reasonable terms and market rates."

2)  Section 5.5 of the Operating Agreement, entitled "Other Activities Permitted," allowed CEJ's "Members, Manager, and their respective affiliates" to have "interests in other present or future ventures, including ventures that are competitive with [CEJ]."  According to the language of this section, the Manager had no obligation to advise the Members regarding potential business opportunities or to account for any profits derived from such ventures.

3)  Exhibit C to the Subscription Agreement, entitled "Risk Factors," disclosed two known conflicts of interest:

Conflicts of Interest
The LLC is subject to various potential conflicts of interest arising out of the relationships between the Manager, the LLC, and their affiliates.  These conflicts include, but are not limited to, those arising from:

The Manager or its affiliates entering into contracts and rendering a

---

[2]In considering a Motion to Dismiss, this Court may consider documents that Plaintiffs referred to in the Complaint and are central to their claims. *Nixon v. Wilmington Trust Co.*, 543 F.3d 354, 357 (6th Cir. 2008).

number of services to the LLC for which it will be paid a fee or from which it may profit; or

The Manager and the LLC are being represented in this transaction by the same legal counsel.  Consequently, the Subscriber should retain its own independent counsel.

The top of Exhibit C also cautioned, in bold capital letters:

Additional risks and uncertainties **not presently known to us or that we currently deem immaterial** may also impair our business operations. (emphasis added).

The Offering Materials did not specifically disclose that Defendants would sell/lease fractional interests in aircraft owned by other companies, for which they would receive commissions. Compl. ¶ 33.  Specifically, Plaintiffs contend that CEMS and Nini maintained undisclosed affiliations with a third-party, Art Van Elslander, that were "competitive to and directly conflict with CEJ's business to CEJ's detriment." Compl. ¶ 41. Mr. Van Elslander allegedly owned CEMS's existing aircraft and paid CEMS a commission for selling and leasing fractional interests in those aircraft.  Compl. ¶ 42.

Relying on the Offering Materials, each Plaintiff purchased a membership interest in CEJ for $500,000.  Compl. ¶ 43.  Plaintiffs assert that they would not have invested in CEJ "had it been known that Nini would be competing against CEJ." *Id.*

2.    *The Investors Discover the Undisclosed Conflicts of Interest*

Three CEJ investors received seats on the board of directors for CEMS.  They first attended board meetings in April, 2007, and again in July, 2007.  At the latter meeting, Plaintiffs learned that Nini was locating prospective purchasers for an aircraft that CEJ did not own.  In response to inquiries from the CEJ investors, Nini revealed that he managed aircraft owned by Mr. Van Elslander and received commission for the sale/lease of interests in Mr. Van Elslander's aircraft. Compl. ¶¶ 45-47.  Plaintiffs contend that Defendants' relationship with Mr. Van Elslander "directly

conflicted with CEJ's interests, and materially impaired [Nini's] ability, as CEMS's President and majority shareholder, to manage CEJ in Plaintiffs' best interest."  Compl. ¶ 49.

In October, 2007, CEMS caused CEJ to acquire a new aircraft, a Raytheon Hawker 800XP ("800XP").  Compl. ¶ 52.  The remainder of Plaintiffs' investment was used as a down payment; the balance was financed by a Florida-regional bank and personally guaranteed by Nini.  *Id.*  As part of the financing arrangement, Nini agreed to market the aircraft in Florida, which would allow the bank to finance the members' purchase/lease interests.  *Id.*  Nevertheless, Plaintiffs contend that Nini marketed the plane exclusively in Michigan (the same market where he worked for Mr. Van Elslander).  Against Plaintiffs' advice, Nini sold a single one-quarter share of the 800XP, in exchange for which he accepted a trade-in of an older Hawker 700 aircraft.  Compl. ¶ 53.  That left CEJ holding two aircraft, one with no investors (the 700), and one that was three-quarters empty (the 800XP).  Compl. ¶ 54.

By early 2009, CEJ had no capital and insufficient revenues to make the loan payments on the 800XP.  Compl. ¶¶ 57-58.  The bank called the loan, and because CEJ was insolvent, Nini's guarantee obligated him personally to pay the debt.  Compl. ¶¶ 58-59.  The Plaintiffs feared that Nini would put his own interests ahead of CEJ's interests by selling the 800XP (at a substantial loss) and using the money to satisfy his guarantee.  Accordingly, Plaintiffs instructed Nini not to sell the 800XP, and established a meeting to discuss available options.  Compl. ¶¶ 59-60.  Despite Nini's assurances that he would not sell the plane, he sold it to Mr. Van Elslander. Compl. ¶ 61.  Plaintiffs allege that Nini acknowledged lying about the sale, explaining  "he did not want Plaintiffs to take any action to stop the sale." *Id.*

## B.  Procedural History

Plaintiffs filed their eleven-count Complaint on July 2, 2009.  Dkt. 1.  In lieu of an answer,

Defendants filed a Motion to Dismiss on September 8, 2009. Dkt. 8.[3] Plaintiffs filed their Response on September 29, 2009. Dkt. 10. Defendants filed their Reply on October 8, 2009. Having compelled arbitration for Counts I-III, the Court must now consider whether Plaintiffs have adequately stated a claim upon which relief may be granted for the remaining Counts (IV - XI).

## II. DISCUSSION

### A. Legal Standard

A court considering a motion to dismiss under Rule 12(b)(6) "must accept all well-pleaded factual allegations of the complaint as true and construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002) (citing *Turker v. Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 456 (6th Cir. 1998)). The court need not, however, "accept as true . . . unwarranted factual interferences." *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

A claim survives this Motion where its "[f]actual allegations [are] enough to raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Thus, this Court will not grant a motion to dismiss for failure to state a claim unless it is "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

### B. Plaintiffs' Claim of Disclosure Violations

---

[3]Defendants actually filed two Motions to Dismiss. The first moved to dismiss and compel arbitration for Counts I, II and III pursuant to an arbitration clause in the Operating Agreement signed by all parties. Dkt. 7. The second, the Motion at issue, moved to dismiss Counts IV through XI for failure to state a claim. Dkt. 8. On October 8, 2009, by agreement of the parties, this Court compelled arbitration for Counts I, II and II, but stayed the arbitration pending resolution by this Court of the remaining Counts. Dkt. 14.

1.    *Regulations and Statutes Cited by Plaintiffs*

Counts IV and V relate to the issue of whether Defendants (respectively, CEMS, and Nini as a Controlling Person) violated the anti-fraud provisions of federal securities law by failing to disclose information in their investment materials concerning certain existing conflicts of interest. The remaining counts, which mirror the allegations of Counts IV and V, are brought under the Michigan Uniform Securities Act (Counts VI and VII), the Florida Securities and Investor Protection Act (Counts VIII and IX), and Illinois Securities Law (Counts X and XI). Defendants do not argue that Nini was not a Controlling Person under the various federal and state securities laws. Accordingly, if Plaintiffs have adequately stated any claim against CEMS, the corresponding controlling-person claim against Nini will survive.

In addition, a securities claim under each State's legislation is nearly identical to the corresponding federal securities fraud claim. *See Ward v. Atlantic Security Bank*, 770 So.2d 1144, 1147 (Fla. Dist. Ct. App. 2001) (Florida); *Branch -Hess Vending Services Employees' Pension Trust v. Guebert*, 751 F. Supp. 1333, 1342 (C.D. Ill. 1990) (Illinois); *Department of Commerce v. DeBeers Diamond Dev't Inv., Ltd.,* 280 N.W.2d 547, 550 (Mich. App. 1979) (Michigan). Thus, as Defendants appear to concede, if Plaintiffs have adequately alleged (a) a claim under the Federal statutes, and (b) the applicability of the state statute to the parties, the state claims will survive the instant Motion to Dismiss. I will therefore begin my analysis with the Federal securities fraud claim against CEMS.

2.    *Securities Fraud Under Section 10(b) and Rule 10b-5 against CEMS*

## Federal Securities Laws are Broad and Flexibly Construed

In Count IV, Plaintiffs allege that Defendants violated: (1) § 10(b) of the Securities Exchange Act of 1934, which prohibits any person from using or employing any "manipulative or deceptive device or contrivance" in connection with the purchase or sale of any security, 15 U.S.C. § 78j(b), and (2) Rule 10b-5, which makes it unlawful for any person, in connection with the purchase or sale of any security, directly or indirectly:

(a) to employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

As the United States Supreme Court explained, "[t]hese proscriptions, by statute and rule, are broad and, by repeated use of the word 'any,' are obviously meant to be inclusive." *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). They "embrace a 'fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'" *Id.* (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963)). The Supreme Court advised that the anti-fraud provisions of securities legislation are to be construed "not technically and restrictively, but flexibly to effectuate [their] remedial purposes." *Id.* quoting *Capital Gains*, 375 U.S. at 195.

"Generally, federal securities law prohibits fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir. 2005) (internal quotations and citation omitted).

Specifically, in order to state a claim under § 10(b) or Rule 10b-5, a plaintiff must allege: (1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by plaintiffs; and (5) proximately causing them injury. *Id.* (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 554 (6th Cir. 2001) (en banc)).  The Sixth Circuit has explained that a statement is "actionable" when it satisfies the first two of these requirements, *"i.e.,* it is a misrepresentation or omission of a material fact that the defendant had a duty to disclose." *Id.*

In the instant Motion, Defendants have argued only that there was no duty to disclose the allegedly omitted information.[4]  Thus, the only issue for the Court is whether the Plaintiffs have sufficiently alleged an <u>actionable</u> misrepresentation or omission.

**Plaintiff's Claim**

Plaintiffs contend that Defendants' duty to disclose the omitted information arose from two places: (1) the Securities Statutes and Regulations; and (2) Defendants' decision to speak about conflicts of interest, which Plaintiffs argue creates a duty to speak fully and completely.

As to the first, Plaintiffs acknowledge that Defendants relied upon the private-placement exemption in Regulation D, Rule 506, 17 C.F.R. § 230.506.  Rule 506 exempts from registration, offerings having no more than 35 purchasers, if each purchaser meets established sophistication criteria or is an "Accredited Investor."[5]  Rule 502(b)(1) states that information need not be furnished

---

[4]Defendants do not argue that Plaintiffs have inadequately pled scienter, reliance, injury, or proximate cause.  And as discussed more fully below, although Defendants do not challenge the materiality of the alleged omissions, in this context the materiality inquiry "coalesces" with the duty inquiry.  Accordingly, I must analyze whether Defendants had a duty to disclose additional information arising from their voluntary, but arguably selective, disclosure.

[5]Each Plaintiff certified his/its Accredited Investor status when signing the Subscription Agreement.

to Accredited Investors.  17 C.F.R. § 502(b)(1).  Accordingly, despite Plaintiffs' contention that Defendants' "express reliance on Regulation D . . . created a representation that Defendants would disclose all information necessary to avoid being misleading" (Response at 12), I find that Defendants had no statutory duty to disclose their conflicts.

This, however, is not the end of the inquiry.  Plaintiffs also claim that, "CEMS, having generally addressed the possibility of unspecified conflicts and competitive interests in the offering materials[,] assumed a duty to speak completely and accurately on these issues . . . ." Compl. ¶ 82. By not fully disclosing CEMS's and Nini's conflicts of interest, Plaintiffs assert that "the [O]ffering [M]aterials created the false impression that neither Nini nor CEMS were aware of any material conflicts and competitive interests or that no such conflicts or competitive interests existed." Compl. ¶ 83.

**Defendants Are Not Exempt From Providing
Truthful and Complete Disclosures When They Speak**

Defendants' entire Motion argues that they are exempt from making any disclosures to Plaintiffs regarding the investments at issue.  Defendants reason that, among other things, Plaintiffs are Accredited Investors who are  presumed to be sophisticated investors.  Therefore, Defendants conclude, the Rules impose no duty on CEMS to provide "any information whatsoever" to Plaintiffs. Motion at 3-8.

Plaintiffs' status as Accredited Investors, however, does not foreclose Defendants' duty to speak truthfully and completely when it chooses to make disclosures.  *Wright v. National Warranty Co., L.P.,* 953 F.2d 256 (6th Cir. 1992) (reversing district court's grant of summary judgment to defendant on § 10(b) and Rule 10b-5 violations, despite plaintiff's status as an Accredited Investor); *Helwig v. Vencor, Inc.*, 251 F.3d at 560 (differentiating between a non-actionable case involving silence absent a duty to disclose, and an actionable  case "about selective disclosure of information

known exclusively to defendants and essential to complete a picture they had only partially revealed").

In this case, neither Defendants' private-placement exemption, nor Plaintiffs' Accredited-Investor status controls. Therefore, I must now determine whether the statements Defendants elected to make are rendered false or misleading in light of the information they withheld.

### Defendants' Statements Regarding Conflicts of Interest
### Created a Duty Not to Mislead

"[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know the fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259, 267 (2d Cir. 1993) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 987 n. 17, 99 L.Ed.2d 194 (1988)). A duty to affirmatively disclose "may arise when there is insider trading, a statute requiring disclosure, or, as relevant to this case, <u>an inaccurate, incomplete or misleading prior disclosure</u>." *City of Monroe*, 399 F.3d at 669 (internal quotations and citations omitted) (emphasis added). Accordingly, even when it has no independent duty to speak, if a company makes a "voluntary disclosure," it must speak "<u>fully and truthfully</u>." *Helwig*, 251 F.3d at 564. *See also Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir. 1979) (holding a newspaper columnist had no statutory duty to disclose his interests in a stock, but he "assumed" the duty to disclose his conflicts of interest when he chose to write a glowing article encouraging purchases of the securities).

In *Helwig*, the Sixth Circuit differentiated between mere silence and selective disclosure. In that case, the district court granted summary judgment for the defendants on the plaintiffs' securities fraud claims, finding the defendants had no duty to disclose the complained-of omissions. The Sixth Circuit, *en banc,* reversed, explaining that, contrary to the district court's framing of the

issue, the question "is not whether [Defendants] had a duty to divulge [the omitted information].

Rather, the question is whether the company had a <u>duty to complete the information already given</u>

concerning [the company's voluntary disclosures]." *Helwig,* 251 F.3d at 561 (emphasis added). The

court answered affirmatively, holding that an actor must "provide complete and non-misleading

information with respect to the subjects on which he undertakes to speak." *Id*. In other words, "a

company may choose silence or speech elaborated by the factual basis as then known – but it may

not choose half-truths." *Id*.

In the earlier case of *Rubin v. Schottenstein*, the Sixth Circuit explained that the duty to speak

"fully and truthfully" arises from Rule 10b-5, itself:

> The question thus is not whether a [defendant's] silence can give rise to liability, but
> whether liability may flow from his decision to speak . . . concerning material details
> . . . without revealing certain additional known facts necessary to make his
> statements not misleading. This question is answered by the text of Rule 10b-5(b)
> itself: it is unlawful for any person to 'omit to state a material fact necessary in order
> to make the statements made, in the light of the circumstances under which they were
> made, not misleading . . . .

143 F.3d 263, 268 (6th Cir. 1998) (en banc) (quoting 17 C.F.R. § 240.10b-5(b)).   Therefore,

whether Defendants "assumed" a duty to disclose known conflicts of interest depends on whether

the conflicts withheld comprise a "material fact" necessary to make its other statements "not

misleading."

For purposes of securities fraud cases, "materiality depends on the significance the

reasonable investor would place on the withheld or misrepresented information." *Basic*, 485 U.S.

at 240.  That is, undisclosed information is material if its disclosure would "significantly alter the

'total mix' of information made available." *Id.* at 231-32 (citations omitted).  For a Complaint to

be dismissed based on the immateriality of an omission, the undisclosed information must have been

"*so obviously unimportant to a reasonable investor that reasonable minds could not differ on the*

*question of [their] unimportance*." *City of Monroe*, 399 F.3d 678-80 (quoting *Helwig*, 251 F.3d at 563) (emphasis in original). Accordingly, although there is a distinction between the concepts of a duty to disclose and materiality, these factors largely "coalesce" where the duty arises from an omitted fact that renders a prior statement false or misleading. *See In re Time Warner*, 9 F.3d at 267-68 (explaining, if a reasonable investor would find omitted information to alter the "total mix" of information disclosed, "it is difficult to imagine a circumstance where the prior statement would not be rendered misleading in the absence of the disclosure.").

When determining whether an omission renders prior statements misleading, context matters. Indeed, "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). For that reason, a material misrepresentation – and the resultant duty to "complete" a disclosure – is measured "not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Id.* Thus, a court must not "pluck" disclosures out of their context and analyze their truth in a vacuum, but must look at the statements in light of the circumstances and events that create the context in which they were made. *See City of Monroe*, 399 F.3d at 672.

Plaintiffs argue that, although Defendants' disclosures regarding potential conflicts of interests may be literally true, they are materially misleading because they "failed to state that CEMS and Nini actually had vested, pecuniary interests in the financial success of ventures that were directly competing against CEJ." Response at 10. Accordingly, Plaintiffs submit that Defendants' omissions were material, and the incomplete disclosures gave the "false impression" that the specific conflicts identified in the Offering Materials "are the only conflicts that may arise or that Defendants were not aware of any other types of conflicts." *Id.* at 10-11. Plaintiffs' position

– that known but undisclosed conflicts are material – finds support in case law.  *See, e.g., SEC v. Washington County Utility District,* 676 F.2d 218, 223, 225 (6th Cir. 1982) (undisclosed conflict of interest is material); *Vernazza v. SEC*, 327 F.3d 851, 859 (9th Cir. 2003) ("It is undisputable that potential conflicts of interest are 'material' facts . . . .") (citation omitted);  *Zweig v. Hearst Corp.*, 594 F.2d 1261 (9th Cir. 1979) (undisclosed conflicts of interest are material).

On the other hand, Defendants contend that their disclosures (*i.e.* that CEMS "may" have "present or future" competitive ventures and "potential conflicts") are "clear," "unambiguous," "accurate," and "literally truthful."  Reply at 4-5; Motion at 6.  Defendants also conclusively argue that their "disclosures . . . were not deliberate misstatements or misleading omissions, and therefore there was no duty to provide additional information."[6]  Reply at 3.  Finally, Defendants reason that, because they "overtly stated [that] there are conflicts and competing business ventures,"[7] any further specificity "would not have changed the meaning or the import of the affirmative disclosures."  *Id*. at 4.

At this stage of the proceedings, I need not decide whether any particular statement is rendered misleading by a particular omission.  I must only determine whether Plaintiffs have sufficiently alleged circumstances under which they could conceivably prove their claim of fraudulent misrepresentation under any set of facts. With this standard in mind, I now consider other

---

[6]Defendants also claim that there is no liability because "CEMS'[s] disclosure of actual and possible conflicts of interest and competition did not make any other statement misleading." Reply at 4 (emphasis added).  Defendants have misread the appropriate inquiry.  The question is not whether Defendants' disclosure renders other statements misleading, but whether Defendants' omissions render their disclosures misleading.

[7]A reasonable juror could find that the Offering Materials did not "overtly state" that there are competing business ventures.  Section 5.5 of the Operating Agreement stated that Defendants may have interests in other competitive ventures; and Section 5.4 permitted affiliated transactions if disclosed and commercially reasonable.  But, when itemizing their conflicts of interest on the Risk Factors disclosure (Subscription Agreement, Exhibit C), no competitive interests were disclosed.

courts' analysis of omission liability.

In *Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598 (6th Cir. 2005), the Sixth Circuit analyzed an investor's claim that a disclosure was misleading under §10(b) and Rule 10b-5. An investment prospective disclosed that sales personnel "may" receive different compensation for selling different classes of shares. Plaintiffs claimed that an existing compensation scheme established conclusively that brokers "did" earn more for selling a certain share class, thus creating a conflict of interest which should have been disclosed. The plaintiffs suggested the "may" disclosure was misleading because the existing compensation scheme was no longer speculative. The Sixth Circuit held that the "semantic quibble" was not misleading, and served to put investors on notice such that they could inquire of their financial advisors if they were concerned about broker incentives. *Id.* at 611-12.

But the Sixth Circuit found a selective disclosure to be actionable in *City of Monroe*, when the court reviewed a dismissal of a claim for securities fraud against Bridgestone. The plaintiff investors argued that, by presenting information to investors regarding accounting principles and loss contingencies, but omitting known contingencies arising from various claims and lawsuits for defective tires, Bridgestone had implied that no such contingency existed. The Sixth Circuit agreed, holding that a reasonable juror could find that Bridgestone's selective disclosures were belied by the existence of the lawsuits and other data suggesting that Bridgestone's tires were defective. Accordingly, the court reversed the dismissal and remanded for further proceedings. *City of Monroe*, 399 F.3d at 669-81.

The Second Circuit arrived at the same conclusion in *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726 (2d Cir.1987). In that case, the defendant, TWA's parent corporation, issued a prospectus for a new issue of TWA stock that discussed "in some detail" the relationship between

TWA and the parent. *Id*. at 735. The parent, however, failed to disclose that it was contemplating termination of its relationship with TWA. *Id*. The court held that a trier of fact could find that the parent's disclosure of one business plan and financing strategy (or strategies) was misleading without disclosure of an alternate considered strategy with substantially more negative implications for investors. *Id*. at 736-37.

And in the recent case of *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603 (S.D.N.Y. 2008), a plaintiff investor alleged that the defendant violated section 10(b) and Rule 10b-5 by disclosing that the defendants investment fund sought to raise $200 million in capital, but failing to reveal that the fund was severely undercapitalized, having raised only $40 million despite lengthy fund-raising efforts. In denying Defendants' 12(b)(6) motion, the court held that, in light of Defendants' funding goal disclosures, a reasonable investor may have considered the omitted information "significant in making investment decisions." *Id*. at 615-17.

Finally, in *Provenz v. Miller*, 102 F.3d 1478, 1488-89 (9th Cir. 1996), the Ninth Circuit reversed the district court's grant of summary judgment to the defendant. The plaintiff alleged that the defendant company failed to reveal that it was having "serious technical problems" with the manufacture of one of its product lines. The district court found the failure to disclose the information was not misleading because the defendants had already disclosed that the program was having problems with its supplier, including sourcing and cost problems. On appeal, the Ninth Circuit found that the generalized disclosures may have been false or misleading:

> There is a difference between knowing that any product-in-development may run into a few snags, and knowing that a particular product has already developed problems so significant as to require months of delay.

*Id*. (citation omitted). Because there was evidence that the defendants were "experiencing more than simply supply problems," a jury could reasonably find that the disclosures about the supply

problems were "false or misleading." *Id.*

I find this case to be more similar to the *City of Monroe/Kronfield/Heller/Provenz* cases than to *Benzon.* This case is not a simple "semantic quibble" about a single statement that conflicts of interest "may" or "do" exist. In this case, Defendants disclosed two specific conflicts of interest[8] while failing to disclose the more significant conflict: CEMS would, at times, act in direct competition with and have interests directly opposed to CEJ's interests. Moreover, at the top of the Risk Factors, Defendants cautioned that "additional risks and uncertainties ***not presently known to us or that we currently deem immaterial*** may also impair our business operations." (emphasis added). A reasonable investor could find this statement misleading, in that it could imply that all known, material risks (including conflicts of interest) have been disclosed. Finally, although the Offering Materials seemingly permit Defendants to have competitive interests, Section 5.4 required transactions involving affiliates to be commercially reasonable and disclosed to the investors. Thus, a reasonable investor may have believed that all known affiliations had been disclosed.

As the Ninth Circuit reasoned in *Provenz*, there is a difference between knowing that a conflict of interest may arise, and knowing of an existing business relationship that results in direct competition. And although Defendants rely on the "literal truth" of their disclosures, the duty to disclose arises if omitted information renders prior statements "materially misleading" – it need not "completely negate" them. *In re Time Warner,* 9 F.3d at 268 . Plaintiffs have sufficiently alleged facts sufficient to bring their claim for misrepresentation by omission above the speculative level. Accordingly, Defendants' Motion to Dismiss as to Count IV is DENIED.

---

[8] These conflicts disclosed: (1) that CEMS would be paid for the management services it rendered to CEJ, and (2) that CEMS and CEJ were represented by the same legal counsel in the formation and capitalization of CEJ. The investors obviously knew of the first by virtue of CEMS's position as Manager of CEJ, and the second is not an uncommon occurrence in the formation of new entities.

2.      *Securities Fraud Under Section 10(b) and Rule 10b-5 against Nini*

Section 20(a) of the Exchange Act imposes on Controlling Persons joint and several liability for securities violations.  15 U.S.C. § 78t(a).  As explained above, Defendants do not dispute that Nini is a Controlling Person under this section.  Therefore, having denied the Motion to Dismiss as to Count IV, I also DENY it with respect to Count V.

3.      *The State Law Claims*

Plaintiffs assert identical claims under the Michigan Uniform Securities Act ("MUSA"), Mich. Comp. Laws §§ 451.810(a)(2), 451.10(b).  Defendants concede that MUSA applies, and recognize that the federal analysis applies to claims under the Michigan statute.  Accordingly, following the same analysis, Defendants' Motion to Dismiss is DENIED as to Counts VI and VII.

For the Florida and Illinois claims, in addition to the "no duty to speak" argument (which I have rejected),  Defendants contend that neither States' statutes apply because the sale and distribution of the securities at issue did not occur in those states.  Motion at 9, 11.  Plaintiffs correctly note that the Florida statutes apply to any sale of securities "to persons of [Florida] from offices outside of this state, by mail or otherwise." *Skurnick v. Ainsworth*, 591 So.2d 904, 906 (Fla. 1991) (finding Florida securities laws to apply to a sale of securities where a Florida resident sent a check from Florida to a broker in New York).  Similarly, the Illinois Securities Law of 1953 applies where any "step toward the completion of the sale" occurs in Illinois – including, for example, where any offering materials are sent to Illinois, or the purchaser submits payment for securities from Illinois. *See Benjamin v. Cablevision Programming Investments*, 499 N.E.2d 1309, 1315 (Ill. 1986) (liberally construing Illinois securities laws, and noting that "it is quite possible that the securities laws of two or more States may apply to a single transaction.").  The Complaint lists two Plaintiffs, Air Banks, LLC and Don Defosset, as Florida residents, and one Plaintiff,

Convenienso, LLC, as an Illinois resident.  Compl. ¶¶ 2, 5, 9.  The Complaint also alleges that each

Plaintiff transmitted funds via a wire transfer to a CEMS bank account.  Compl. ¶ 43.  Construing

the facts in the light most favorable to Plaintiffs, it is reasonable to infer that each Plaintiffs

"purchased" the securities from his home state, and caused payment to be wired from within that

state.  As such, the Complaint sufficiently alleges that Defendants sold securities in Florida and

Illinois, at least as to the Plaintiffs residing in those states, and Defendants' Motion to Dismiss is

DENIED with respect to Counts VIII through XI.

### III.  CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss is DENIED in its entirety.


**IT IS SO ORDERED.**

Date: <u>November 30, 2009</u>                    <u>s/ John Feikens</u>
                                                    United States District Judge

```
+---------------------------------------------------+
|                  Proof of Service                 |
|                                                   |
|  I hereby certify that the foregoing order was    |
|  served on the attorneys/parties of record on     |
|  November 30, 2009, by U.S. first class mail or    |
|  electronic means.                                |
|                                                   |
|                      s/Carol Cohron               |
|                      Case Manager                 |
+---------------------------------------------------+
```

19